Justice KENNEDYdelivered the opinion of the Court.
In this case, the Supreme Court of Pennsylvania vacated the decision of a postconviction court, which had granted relief to a prisoner convicted of first-degree murder and sentenced to death. One of the justices on the State Supreme Court had been the district attorney who gave his official approval to seek the death penalty in the prisoner's case. The justice in question denied the prisoner's motion for recusal and participated in the decision to deny relief. The question presented is whether the justice's denial of the recusal motion and his subsequent judicial participation violated the Due Process Clause of the Fourteenth Amendment.
This Court's precedents set forth an objective standard that requires recusal when the likelihood of bias on the part of the judge " 'is too high to be constitutionally tolerable.' " Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 872, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009)(quoting Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975)). Applying this standard, the Court concludes that due process compelled the justice's recusal.
I
Petitioner is Terrance Williams. In 1984, soon after Williams turned 18, he murdered 56-year-old Amos Norwood in Philadelphia. At trial, the Commonwealth presented evidence that Williams and a friend, Marc Draper, had been standing on a street corner when Norwood drove by. Williams and Draper requested a ride home from Norwood, who agreed. Draper then gave Norwood false directions that led him to drive toward a cemetery. Williams and Draper ordered Norwood out of the car and into the cemetery. There, the two men tied Norwood in his own clothes and beat him to death. Testifying for the Commonwealth, Draper suggested that robbery was the motive for the crime. Williams took the stand in his own defense, stating that he was not involved in the crime and did not know the victim.
During the trial, the prosecutor requested permission from her supervisors in the district attorney's office to seek the death penalty against Williams. To support the request, she prepared a memorandum setting forth the details of the crime, information supporting two statutory aggravating factors, and facts in mitigation. After reviewing the memorandum, the then-district attorney of Philadelphia, Ronald Castille, wrote this note at the bottom of the document: "Approved to proceed on the death penalty." App. 426a.
During the penalty phase of the trial, the prosecutor argued that Williams deserved a death sentence because he killed Norwood " 'for no other reason but that a kind man offered him a ride home.' " Brief for Petitioner 7. The jurors found two aggravating circumstances: that the murder *1904 was committed during the course of a robbery and that Williams had a significant history of violent felony convictions. That criminal history included a previous conviction for a murder he had committed at age 17. The jury found no mitigating circumstances and sentenced Williams to death. Over a period of 26 years, Williams's conviction and sentence were upheld on direct appeal, state postconviction review, and federal habeas review.
In 2012, Williams filed a successive petition pursuant to Pennsylvania's Post Conviction Relief Act (PCRA), 42 Pa. Cons.Stat. § 9541 et seq. (2007). The petition was based on new information from Draper, who until then had refused to speak with Williams's attorneys. Draper told Williams's counsel that he had informed the Commonwealth before trial that Williams had been in a sexual relationship with Norwood and that the relationship was the real motive for Norwood's murder. According to Draper, the Commonwealth had instructed him to give false testimony that Williams killed Norwood to rob him. Draper also admitted he had received an undisclosed benefit in exchange for his testimony: the trial prosecutor had promised to write a letter to the state parole board on his behalf. At trial, the prosecutor had elicited testimony from Draper indicating that his only agreement with the prosecution was to plead guilty in exchange for truthful testimony. No mention was made of the additional promise to write the parole board.
The Philadelphia Court of Common Pleas, identified in the proceedings below as the PCRA court, held an evidentiary hearing on Williams's claims. Williams alleged in his petition that the prosecutor had procured false testimony from Draper and suppressed evidence regarding Norwood's sexual relationship with Williams. At the hearing, both Draper and the trial prosecutor testified regarding these allegations. The PCRA court ordered the district attorney's office to produce the previously undisclosed files of the prosecutor and police. These documents included the trial prosecutor's sentencing memorandum, bearing then-District Attorney Castille's authorization to pursue the death penalty. Based on the Commonwealth's files and the evidentiary hearing, the PCRA court found that the trial prosecutor had suppressed material, exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and engaged in "prosecutorial gamesmanship." App. 168a. The court stayed Williams's execution and ordered a new sentencing hearing.
Seeking to vacate the stay of execution, the Commonwealth submitted an emergency application to the Pennsylvania Supreme Court. By this time, almost three decades had passed since Williams's prosecution. Castille had been elected to a seat on the State Supreme Court and was serving as its chief justice. Williams filed a response to the Commonwealth's application. The disclosure of the trial prosecutor's sentencing memorandum in the PCRA proceedings had alerted Williams to Chief Justice Castille's involvement in the decision to seek a death sentence in his case. For this reason, Williams also filed a motion asking Chief Justice Castille to recuse himself or, if he declined to do so, to refer the recusal motion to the full court for decision. The Commonwealth opposed Williams's recusal motion. Without explanation, Chief Justice Castille denied the motion for recusal and the request for its referral. Two days later, the Pennsylvania Supreme Court denied the application to vacate the stay and ordered full briefing on the issues raised in the appeal. The State Supreme Court then vacated the PCRA court's order granting penalty-phase relief and reinstated Williams's *1905 death sentence. Chief Justice Castille and Justices Baer and Stevens joined the majority opinion written by Justice Eakin. Justices Saylor and Todd concurred in the result without issuing a separate opinion. See 629 Pa. 533, ----, 105 A.3d 1234, 1245 (2014).
Chief Justice Castille authored a concurrence. He lamented that the PCRA court had "lost sight of its role as a neutral judicial officer" and had stayed Williams's execution "for no valid reason." Id., at ----, 105 A.3d, at 1245. "[B]efore condemning officers of the court," the chief justice stated, "the tribunal should be aware of the substantive status of Brady law," which he believed the PCRA court had misapplied. Id., at ----, 105 A.3d, at 1246. In addition, Chief Justice Castille denounced what he perceived as the "obstructionist anti-death penalty agenda" of Williams's attorneys from the Federal Community Defender Office. Ibid. PCRA courts "throughout Pennsylvania need to be vigilant and circumspect when it comes to the activities of this particular advocacy group," he wrote, lest Defender Office lawyers turn postconviction proceedings "into a circus where [they] are the ringmasters, with their parrots and puppets as a sideshow." Id., at ----, 105 A.3d, at 1247.
Two weeks after the Pennsylvania Supreme Court decided Williams's case, Chief Justice Castille retired from the bench. This Court granted Williams's petition for certiorari. 576 U.S. ----, 136 S.Ct. 28, 192 L.Ed.2d 999 (2015).
II
A
Williams contends that Chief Justice Castille's decision as district attorney to seek a death sentence against him barred the chief justice from later adjudicating Williams's petition to overturn that sentence. Chief Justice Castille, Williams argues, violated the Due Process Clause of the Fourteenth Amendment by acting as both accuser and judge in his case.
The Court's due process precedents do not set forth a specific test governing recusal when, as here, a judge had prior involvement in a case as a prosecutor. For the reasons explained below, however, the principles on which these precedents rest dictate the rule that must control in the circumstances here. The Court now holds that under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case.
Due process guarantees "an absence of actual bias" on the part of a judge. In re Murchison, 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955). Bias is easy to attribute to others and difficult to discern in oneself. To establish an enforceable and workable framework, the Court's precedents apply an objective standard that, in the usual case, avoids having to determine whether actual bias is present. The Court asks not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, "the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.' " Caperton, 556 U.S., at 881, 129 S.Ct. 2252. Of particular relevance to the instant case, the Court has determined that an unconstitutional potential for bias exists when the same person serves as both accuser and adjudicator in a case. See Murchison, 349 U.S., at 136-137, 75 S.Ct. 623. This objective risk of bias is reflected in the due process maxim that "no man can be a judge in his own case and no man is permitted to try cases where he has an interest *1906 in the outcome." Id ., at 136, 75 S.Ct. 623.
The due process guarantee that "no man can be a judge in his own case" would have little substance if it did not disqualify a former prosecutor from sitting in judgment of a prosecution in which he or she had made a critical decision. This conclusion follows from the Court's analysis in In re Murchison . That case involved a "one-man judge-grand jury" proceeding, conducted pursuant to state law, in which the judge called witnesses to testify about suspected crimes. Id ., at 134. During the course of the examinations, the judge became convinced that two witnesses were obstructing the proceeding. He charged one witness with perjury and then, a few weeks later, tried and convicted him in open court. The judge charged the other witness with contempt and, a few days later, tried and convicted him as well. This Court overturned the convictions on the ground that the judge's dual position as accuser and decisionmaker in the contempt trials violated due process: "Having been a part of [the accusatory] process a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused." Id ., at 137.
No attorney is more integral to the accusatory process than a prosecutor who participates in a major adversary decision. When a judge has served as an advocate for the State in the very case the court is now asked to adjudicate, a serious question arises as to whether the judge, even with the most diligent effort, could set aside any personal interest in the outcome. There is, furthermore, a risk that the judge "would be so psychologically wedded" to his or her previous position as a prosecutor that the judge "would consciously or unconsciously avoid the appearance of having erred or changed position." Withrow, 421 U.S., at 57, 95 S.Ct. 1456. In addition, the judge's "own personal knowledge and impression" of the case, acquired through his or her role in the prosecution, may carry far more weight with the judge than the parties' arguments to the court. Murchison, supra, at 138, 75 S.Ct. 623; see also Caperton, supra, at 881, 129 S.Ct. 2252.
Pennsylvania argues that Murchison does not lead to the rule that due process requires disqualification of a judge who, in an earlier role as a prosecutor, had significant involvement in making a critical decision in the case. The facts of Murchison, it should be acknowledged, differ in many respects from a case like this one. In Murchison, over the course of several weeks, a single official (the so-called judge-grand jury) conducted an investigation into suspected crimes; made the decision to charge witnesses for obstruction of that investigation; heard evidence on the charges he had lodged; issued judgments of conviction; and imposed sentence. See 349 U.S., at 135, 75 S.Ct. 623(petitioners objected to "trial before the judge who was at the same time the complainant, indicter and prosecutor"). By contrast, a judge who had an earlier involvement in a prosecution might have been just one of several prosecutors working on the case at each stage of the proceedings; the prosecutor's immediate role might have been limited to a particular aspect of the prosecution; and decades might have passed before the former prosecutor, now a judge, is called upon to adjudicate a claim in the case.
These factual differences notwithstanding, the constitutional principles explained in Murchison are fully applicable where a judge had a direct, personal role in the defendant's prosecution. The involvement of other actors and the passage of time are consequences of a complex criminal justice system, in which a single *1907 case may be litigated through multiple proceedings taking place over a period of years. This context only heightens the need for objective rules preventing the operation of bias that otherwise might be obscured. Within a large, impersonal system, an individual prosecutor might still have an influence that, while not so visible as the one-man grand jury in Murchison, is nevertheless significant. A prosecutor may bear responsibility for any number of critical decisions, including what charges to bring, whether to extend a plea bargain, and which witnesses to call. Even if decades intervene before the former prosecutor revisits the matter as a jurist, the case may implicate the effects and continuing force of his or her original decision. In these circumstances, there remains a serious risk that a judge would be influenced by an improper, if inadvertent, motive to validate and preserve the result obtained through the adversary process. The involvement of multiple actors and the passage of time do not relieve the former prosecutor of the duty to withdraw in order to ensure the neutrality of the judicial process in determining the consequences that his or her own earlier, critical decision may have set in motion.
B
This leads to the question whether Chief Justice Castille's authorization to seek the death penalty against Williams amounts to significant, personal involvement in a critical trial decision. The Court now concludes that it was a significant, personal involvement; and, as a result, Chief Justice Castille's failure to recuse from Williams's case presented an unconstitutional risk of bias.
As an initial matter, there can be no doubt that the decision to pursue the death penalty is a critical choice in the adversary process. Indeed, after a defendant is charged with a death-eligible crime, whether to ask a jury to end the defendant's life is one of the most serious discretionary decisions a prosecutor can be called upon to make.
Nor is there any doubt that Chief Justice Castille had a significant role in this decision. Without his express authorization, the Commonwealth would not have been able to pursue a death sentence against Williams. The importance of this decision and the profound consequences it carries make it evident that a responsible prosecutor would deem it to be a most significant exercise of his or her official discretion and professional judgment.
Pennsylvania nonetheless contends that Chief Justice Castille in fact did not have significant involvement in the decision to seek a death sentence against Williams. The chief justice, the Commonwealth points out, was the head of a large district attorney's office in a city that saw many capital murder trials. Tr. of Oral Arg. 36. According to Pennsylvania, his approval of the trial prosecutor's request to pursue capital punishment in Williams's case amounted to a brief administrative act limited to "the time it takes to read a one-and-a-half-page memo." Ibid. In this Court's view, that characterization cannot be credited. The Court will not assume that then-District Attorney Castille treated so major a decision as a perfunctory task requiring little time, judgment, or reflection on his part.
Chief Justice Castille's own comments while running for judicial office refute the Commonwealth's claim that he played a mere ministerial role in capital sentencing decisions. During the chief justice's election campaign, multiple news outlets reported his statement that he "sent 45 people to death rows" as district attorney. Seelye, Castille Keeps His Cool in Court Run, Philadelphia Inquirer, Apr. 30, 1993, *1908 p. B1; see also, e.g., Brennan, State Voters Must Choose Next Supreme Court Member, Legal Intelligencer, Oct. 28, 1993, pp. 1, 12. Chief Justice Castille's willingness to take personal responsibility for the death sentences obtained during his tenure as district attorney indicate that, in his own view, he played a meaningful role in those sentencing decisions and considered his involvement to be an important duty of his office.
Although not necessary to the disposition of this case, the PCRA court's ruling underscores the risk of permitting a former prosecutor to be a judge in what had been his or her own case. The PCRA court determined that the trial prosecutor-Chief Justice Castille's former subordinate in the district attorney's office-had engaged in multiple, intentional Brady violations during Williams's prosecution. App. 131-145, 150-154. While there is no indication that Chief Justice Castille was aware of the alleged prosecutorial misconduct, it would be difficult for a judge in his position not to view the PCRA court's findings as a criticism of his former office and, to some extent, of his own leadership and supervision as district attorney.
The potential conflict of interest posed by the PCRA court's findings illustrates the utility of statutes and professional codes of conduct that "provide more protection than due process requires." Caperton, 556 U.S., at 890, 129 S.Ct. 2252. It is important to note that due process "demarks only the outer boundaries of judicial disqualifications." Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 828, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). Most questions of recusal are addressed by more stringent and detailed ethical rules, which in many jurisdictions already require disqualification under the circumstances of this case. See Brief for American Bar Association as Amicus Curiae 5, 11-14; see also ABA Model Code of Judicial Conduct Rules 2.11(A)(1), (A)(6)(b) (2011) (no judge may participate "in any proceeding in which the judge's impartiality might reasonably be questioned," including where the judge "served in governmental employment, and in such capacity participated personally and substantially as a lawyer or public official concerning the proceeding"); ABA Center for Professional Responsibility Policy Implementation Comm., Comparison of ABA Model Judicial Code and State Variations (Dec. 14, 2015), available at http://www.americanbar.org/content/dam/aba/administrative/professional_responsibility/2_11.authcheckdam.pdf (as last visited June 7, 2016) (28 States have adopted language similar to ABA Model Judicial Code Rule 2.11); 28 U.S.C. § 455(b)(3)(recusal required where judge "has served in governmental employment and in such capacity participated as counsel, adviser or material witness concerning the proceeding"). At the time Williams filed his recusal motion with the Pennsylvania Supreme Court, for example, Pennsylvania's Code of Judicial Conduct disqualified judges from any proceeding in which "they served as a lawyer in the matter in controversy, or a lawyer with whom they previously practiced law served during such association as a lawyer concerning the matter...." Pa.Code of Judicial Conduct, Canon 3C (1974, as amended). The fact that most jurisdictions have these rules in place suggests that today's decision will not occasion a significant change in recusal practice.
Chief Justice Castille's significant, personal involvement in a critical decision in Williams's case gave rise to an unacceptable risk of actual bias. This risk so endangered the appearance of neutrality that his participation in the case "must be forbidden if the guarantee of due process is to be *1909 adequately implemented." Withrow, 421 U.S., at 47, 95 S.Ct. 1456.
III
Having determined that Chief Justice Castille's participation violated due process, the Court must resolve whether Williams is entitled to relief. In past cases, the Court has not had to decide the question whether a due process violation arising from a jurist's failure to recuse amounts to harmless error if the jurist is on a multimember court and the jurist's vote was not decisive. See Lavoie, supra, at 827-828, 106 S.Ct. 1580(addressing "the question whether a decision of a multimember tribunal must be vacated because of the participation of one member who had an interest in the outcome of the case," where that member's vote was outcome determinative). For the reasons discussed below, the Court holds that an unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote.
The Court has little trouble concluding that a due process violation arising from the participation of an interested judge is a defect "not amenable" to harmless-error review, regardless of whether the judge's vote was dispositive. Puckett v. United States, 556 U.S. 129, 141, 129 S.Ct. 1423, 173 L.Ed.2d 266 (2009)(emphasis deleted). The deliberations of an appellate panel, as a general rule, are confidential. As a result, it is neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process. Indeed, one purpose of judicial confidentiality is to assure jurists that they can reexamine old ideas and suggest new ones, while both seeking to persuade and being open to persuasion by their colleagues. As Justice Brennan wrote in his Lavoie concurrence,
"The description of an opinion as being 'for the court' connotes more than merely that the opinion has been joined by a majority of the participating judges. It reflects the fact that these judges have exchanged ideas and arguments in deciding the case. It reflects the collective process of deliberation which shapes the court's perceptions of which issues must be addressed and, more importantly, how they must be addressed. And, while the influence of any single participant in this process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition." 475 U.S., at 831, 106 S.Ct. 1580.
These considerations illustrate, moreover, that it does not matter whether the disqualified judge's vote was necessary to the disposition of the case. The fact that the interested judge's vote was not dispositive may mean only that the judge was successful in persuading most members of the court to accept his or her position. That outcome does not lessen the unfairness to the affected party. See id ., at 831-832, 106 S.Ct. 1580(Blackmun, J., concurring in judgment).
A multimember court must not have its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part. An insistence on the appearance of neutrality is not some artificial attempt to mask imperfection in the judicial process, but rather an essential means of ensuring the reality of a fair adjudication. Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself. When the objective risk of actual bias on the part of a judge rises to an unconstitutional *1910 level, the failure to recuse cannot be deemed harmless.
The Commonwealth points out that ordering a rehearing before the Pennsylvania Supreme Court may not provide complete relief to Williams because judges who were exposed to a disqualified judge may still be influenced by their colleague's views when they rehear the case. Brief for Respondent 51, 62. An inability to guarantee complete relief for a constitutional violation, however, does not justify withholding a remedy altogether. Allowing an appellate panel to reconsider a case without the participation of the interested member will permit judges to probe lines of analysis or engage in discussions they may have felt constrained to avoid in their first deliberations.
Chief Justice Castille's participation in Williams's case was an error that affected the State Supreme Court's whole adjudicatory framework below. Williams must be granted an opportunity to present his claims to a court unburdened by any "possible temptation ... not to hold the balance nice, clear and true between the State and the accused." Tumey v. Ohio, 273 U.S. 510, 532, 47 S.Ct. 437, 71 L.Ed. 749 (1927).
* * *
Where a judge has had an earlier significant, personal involvement as a prosecutor in a critical decision in the defendant's case, the risk of actual bias in the judicial proceeding rises to an unconstitutional level. Due process entitles Terrance Williams to "a proceeding in which he may present his case with assurance" that no member of the court is "predisposed to find against him." Marshall v. Jerrico, Inc., 446 U.S. 238, 242, 100 S.Ct. 1610, 64 L.Ed.2d 182 (1980).
The judgment of the Supreme Court of Pennsylvania is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.
It is so ordered.
Chief Justice ROBERTS, with whom Justice ALITOjoins, dissenting.
In 1986, Ronald Castille, then District Attorney of Philadelphia, authorized a prosecutor in his office to seek the death penalty against Terrance Williams. Almost 30 years later, as Chief Justice of the Pennsylvania Supreme Court, he participated in deciding whether Williams's fifth habeas petition-which raised a claim unconnected to the prosecution's decision to seek the death penalty-could be heard on the merits or was instead untimely. This Court now holds that because Chief Justice Castille made a "critical" decision as a prosecutor in Williams's case, there is a risk that he "would be so psychologically wedded" to his previous decision that it would violate the Due Process Clause for him to decide the distinct issues raised in the habeas petition. Ante, at 1905 - 1906 (internal quotation marks omitted). According to the Court, that conclusion follows from the maxim that "no man can be a judge in his own case." Ante, at 1905 - 1906 (internal quotation marks omitted).
The majority opinion rests on proverb rather than precedent. This Court has held that there is "a presumption of honesty and integrity in those serving as adjudicators." Withrow v. Larkin, 421 U.S. 35, 47, 95 S.Ct. 1456, 43 L.Ed.2d 712 (1975). To overcome that presumption, the majority relies on In re Murchison, 349 U.S. 133, 75 S.Ct. 623, 99 L.Ed. 942 (1955). We concluded there that the Due Process Clause is violated when a judge adjudicates the same question-based on the same facts-that he had already considered as a grand juror in the same case. Here, however, Williams does not allege that Chief Justice Castille had any previous *1911 knowledge of the contested facts at issue in the habeas petition, or that he had previously made any decision on the questions raised by that petition. I would accordingly hold that the Due Process Clause did not require Chief Justice Castille's recusal.
I
In 1986, petitioner Terrance Williams stood trial for the murder of Amos Norwood. Prosecutors believed that Williams and his friend Marc Draper had asked Norwood for a ride, directed him to a cemetery, and then beat him to death with a tire iron after robbing him. Andrea Foulkes, the Philadelphia Assistant District Attorney prosecuting the case, prepared a one-and-a-half page memo for her superiors-Homicide Unit Chief Mark Gottlieb and District Attorney Ronald Castille-"request[ing] that we actively seek the death penalty." App. 424a. The memo briefly described the facts of the case and Williams's prior felonies, including a previous murder conviction. Gottlieb read the memo and then passed it to Castille with a note recommending the death penalty. Id., at 426a. Castille wrote at the bottom of the memo, "Approved to proceed on the death penalty," and signed his name. Ibid.
At trial, Williams testified that he had never met Norwood and that someone else must have murdered him. After hearing extensive evidence linking Williams to the crime, the jury convicted him of murder and sentenced him to death. 524 Pa. 218, 227, 570 A.2d 75, 79-80 (1990).
In 1995, Williams filed a habeas petition in Pennsylvania state court, alleging that his trial counsel had been ineffective for failing to present mitigating evidence of his childhood sexual abuse, among other claims. At a hearing related to that petition, Williams acknowledged that he knew Norwood and claimed that Norwood had sexually abused him. 629 Pa. 533, ----, 105 A.3d 1234, 1240 (2014). The petition was denied. Williams filed two more state habeas petitions, which were both dismissed as untimely, and a federal habeas petition, which was also denied. See Williams v. Beard, 637 F.3d 195, 238 (C.A.3 2011).
This case arises out of Williams's fifth habeas petition, which he filed in state court in 2012. In that petition, Williams argued that he was entitled to a new sentencing proceeding because the prosecution at trial had failed to turn over certain evidence suggesting that "Norwood was sexually involved with boys around [Williams's] age at the time of his murder." Crim. No. CP-51-CR-0823621-1984 (Phila. Ct. Common Pleas, Nov. 27, 2012), App. 80a.
It is undisputed that Williams's fifth habeas petition is untimely under Pennsylvania law. In order to overcome that time bar, Pennsylvania law required Williams to show that "(1) the failure to previously raise [his] claim was the result of interference by government officials and (2) the information on which he relies could not have been obtained earlier with the exercise of due diligence." --- Pa., at ----, 105 A.3d, at 1240. The state habeas court held that Williams met that burden because "the government withheld multiple statements from [Williams's] trial counsel, all of which strengthened the inference that Amos Norwood was sexually inappropriate with a number of teenage boys," and Williams was unable to access those statements until an evidentiary proceeding ordered by the court. App. 95a.
The Commonwealth appealed to the Pennsylvania Supreme Court, and Williams filed a motion requesting that Chief Justice Castille recuse himself on the ground that he had "personally authorized *1912 his Office to seek the death penalty" nearly 30 years earlier. Id., at 181a (emphasis deleted). Chief Justice Castille summarily denied the recusal motion, and the six-member Pennsylvania Supreme Court proceeded to hear the case. The court unanimously reinstated Williams's sentence.
According to the Pennsylvania Supreme Court, Williams failed to make the threshold showing necessary to overcome the time bar because there was "abundant evidence" that Williams "knew of Norwood's homosexuality and conduct with teenage boys well before trial, sufficient to present [Norwood] as unsympathetic before the jury." --- Pa., at ----, 105 A.3d, at 1241. The court pointed out that Williams was, of course, personally aware of Norwood's abuse and could have raised the issue at trial, but instead chose to disclaim having ever met Norwood. The court also noted that Williams had raised similar claims of abuse in his first state habeas proceeding. Ibid. Chief Justice Castille concurred separately, criticizing the lower court for failing to dismiss Williams's petition as "time-barred and frivolous." Id., at ----, 105 A.3d, at 1245.
II
A
In the context of a criminal proceeding, the Due Process Clause requires States to adopt those practices that are fundamental to principles of liberty and justice, and which inhere "in the very idea of free government" and are "the inalienable right of a citizen of such a government." Twining v. New Jersey, 211 U.S. 78, 106, 29 S.Ct. 14, 53 L.Ed. 97 (1908). A fair trial and appeal is one such right. See Lisenba v. California, 314 U.S. 219, 236, 62 S.Ct. 280, 86 L.Ed. 166 (1941); Aetna Life Ins. Co. v. Lavoie, 475 U.S. 813, 825, 106 S.Ct. 1580, 89 L.Ed.2d 823 (1986). In ensuring that right, "it is normally within the power of the State to regulate procedures under which its laws are carried out," unless a procedure "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." Id., at 821, 106 S.Ct. 1580(internal quotation marks omitted).
It is clear that a judge with "a direct, personal, substantial, pecuniary interest" in a case may not preside over that case. Tumey v. Ohio, 273 U.S. 510, 523, 47 S.Ct. 437, 71 L.Ed. 749 (1927). We have also held that a judge may not oversee a criminal contempt proceeding where the judge has previously served as grand juror in the same case, or where the party charged with contempt has conducted "an insulting attack upon the integrity of the judge carrying such potential for bias as to require disqualification." Mayberry v. Pennsylvania, 400 U.S. 455, 465-466, 91 S.Ct. 499, 27 L.Ed.2d 532 (1971)(internal quotation marks omitted); see Murchison, 349 U.S., at 139, 75 S.Ct. 623.
Prior to this Court's decision in Caperton v. A.T. Massey Coal Co., 556 U.S. 868, 129 S.Ct. 2252, 173 L.Ed.2d 1208 (2009), we had declined to require judicial recusal under the Due Process Clause beyond those defined situations. In Caperton, however, the Court adopted a new standard that requires recusal "when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." Id., at 872, 129 S.Ct. 2252(internal quotation marks omitted). The Court framed the inquiry as "whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process is to be adequately implemented." Id., at 883-884, 129 S.Ct. 2252(internal quotation marks omitted).
*1913 B
According to the majority, the Due Process Clause required Chief Justice Castille's recusal because he had "significant, personal involvement in a critical trial decision" in Williams's case. Ante, at 1907. Otherwise, the majority explains, there is "an unacceptable risk of actual bias." Ante, at 1908. In the majority's view, "[t]his conclusion follows from the Court's analysis in In re Murchison ." Ante, at 1906. But Murchison does not support the majority's new rule-far from it.
Murchison involved a peculiar Michigan law that authorized the same person to sit as both judge and "one-man grand jury" in the same case. 349 U.S., at 133, 75 S.Ct. 623(internal quotation marks omitted). Pursuant to that law, a Michigan judge-serving as grand jury-heard testimony from two witnesses in a corruption case. The testimony "persuaded" the judge that one of the witnesses "had committed perjury"; the second witness refused to answer questions. Id., at 134-135, 75 S.Ct. 623. The judge accordingly charged the witnesses with criminal contempt, presided over the trial, and convicted them. Ibid. We reversed, holding that the trial had violated the Due Process Clause. Id., at 139, 75 S.Ct. 623.
The Court today, acknowledging that Murchison "differ[s] in many respects from a case like this one," ante, at 1906, earns full marks for understatement. The Court in fact fails to recognize the differences that are critical.
First, Murchison found a due process violation because the judge (sitting as grand jury) accused the witnesses of contempt, and then (sitting as judge) presided over their trial on that charge. As a result, the judge had made up his mind about the only issue in the case before the trial had even begun. We held that such prejudgment violated the Due Process Clause. 349 U.S., at 137, 75 S.Ct. 623.
Second, Murchison expressed concern that the judge's recollection of the testimony he had heard as grand juror was "likely to weigh far more heavily with him than any testimony given" at trial. Id., at 138, 75 S.Ct. 623. For that reason, the Court found that the judge was at risk of calling "on his own personal knowledge and impression of what had occurred in the grand jury room," rather than the evidence presented to him by the parties. Ibid.
Neither of those due process concerns is present here. Chief Justice Castille was involved in the decision to seek the death penalty, and perhaps it would be reasonable under Murchison to require him to recuse himself from any challenge casting doubt on that recommendation. But that is not this case.
This case is about whether Williams may overcome the procedural bar on filing an untimely habeas petition, which required him to show that the government interfered with his ability to raise his habeas claim, and that "the information on which he relies could not have been obtained earlier with the exercise of due diligence." --- Pa., at ----, 105 A.3d, at 1240. Even if Williams were to overcome the timeliness bar, moreover, the only claim he sought to raise on the merits was that the prosecution had failed to turn over certain evidence at trial. The problem in Murchison was that the judge, having been "part of the accusatory process" regarding the guilt or innocence of the defendants, could not then be "wholly disinterested" when called upon to decide that very same issue. 349 U.S., at 137, 75 S.Ct. 623. In this case, in contrast, neither the procedural question nor Williams's merits claim in any way concerns the pretrial decision to seek the death penalty.
*1914 It is abundantly clear that, unlike in Murchison, Chief Justice Castille had not made up his mind about either the contested evidence or the legal issues under review in Williams's fifth habeas petition. How could he have? Neither the contested evidence nor the legal issues were ever before him as prosecutor. The one-and-a-half page memo prepared by Assistant District Attorney Foulkes in 1986 did not discuss the evidence that Williams claims was withheld by the prosecution at trial. It also did not discuss Williams's allegation that Norwood sexually abused young men. It certainly did not discuss whether Williams could have obtained that evidence of abuse earlier through the exercise of due diligence.
Williams does not assert that Chief Justice Castille had any prior knowledge of the alleged failure of the prosecution to turn over such evidence, and he does not argue that Chief Justice Castille had previously made any decision with respect to that evidence in his role as prosecutor. Even assuming that Chief Justice Castille remembered the contents of the memo almost 30 years later-which is doubtful-the memo could not have given Chief Justice Castille any special "impression" of facts or issues not raised in that memo. Id., at 138, 75 S.Ct. 623.
The majority attempts to justify its rule based on the "risk" that a judge "would be so psychologically wedded to his or her previous position as a prosecutor that the judge would consciously or unconsciously avoid the appearance of having erred or changed position." Ante, at 1906 (internal quotation marks omitted). But as a matter of simple logic, nothing about how Chief Justice Castille might rule on Williams's fifth habeas petition would suggest that the judge had erred or changed his position on the distinct question whether to seek the death penalty prior to trial. In sum, there was not such an "objective risk of actual bias," ante, at 1909, that it was fundamentally unfair for Chief Justice Castille to participate in the decision of an issue having nothing to do with his prior participation in the case.
* * *
The Due Process Clause did not prohibit Chief Justice Castille from hearing Williams's case. That does not mean, however, that it was appropriate for him to do so. Williams cites a number of state court decisions and ethics opinions that prohibit a prosecutor from later serving as judge in a case that he has prosecuted. Because the Due Process Clause does not mandate recusal in cases such as this, it is up to state authorities-not this Court-to determine whether recusal should be required.
I would affirm the judgment of the Pennsylvania Supreme Court, and respectfully dissent from the Court's contrary conclusion.