**[J-22-2021] [MO: Dougherty, J.]**
**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

| | | |
|---|---|---|
| STEPHEN PASCAL AND CHRIS GATES, | : | No. 22 WAP 2020 |
| | : | |
| Appellants | : | Appeal from the Order of the |
| | : | Commonwealth Court entered |
| | : | February 28, 2020 at No. 496 CD |
| v. | : | 2019, affirming the Order of the |
| | : | Court of Common Pleas of |
| | : | Allegheny County entered March 27, |
| CITY OF PITTSBURGH ZONING BOARD | : | 2019 at No. SA 18-000792. |
| OF ADJUSTMENT, AND CITY OF | : | |
| PITTSBURGH AND NORTHSIDE | : | ARGUED: April 13, 2021 |
| LEADERSHIP CONFERENCE, | : | |
| | : | |
| Appellees | : | |

**CONCURRING AND DISSENTING OPINION**

**JUSTICE WECHT**                                    **DECIDED: SEPTEMBER 22, 2021**

I dissent from Part II of the Majority's opinion regarding the timeliness of the Pittsburgh Zoning Board of Appeal's ("ZBA") decision. I would reverse the Commonwealth Court on that basis because it is not this Court's job to rewrite, add, or modify statutory requirements in the Pittsburgh Zoning Code ("Code").[1] However, I join Part III of the Court's opinion regarding LaShawn Burton-Faulk's conflict of interest.

---

[1]      Zoning by Pittsburgh is not governed by the Municipalities Planning Code ("MPC"), 53 P.S. §§ 10101-11201, because the MPC does not apply to cities like Pittsburgh. *Id.* §§ 10103, 10107. Instead, zoning by Pittsburgh is governed by provisions of the cities of the second class zoning statute, *id.* §§ 25051-25058, which empowers such cities to enact zoning ordinances. *Id.* § 25051; *see also City of Pittsburgh v. Commonwealth*, 360 A.2d 607, 610 (Pa. 1976) ("Municipalities derive their power to enact zoning ordinances from specific grants by the Legislature.").

**I.**

Northside Leadership Conference ("NLC"), a non-profit community development corporation, sought to upgrade some buildings it owns in the East Allegheny neighborhood of Pittsburgh. These upgrades required several variances and special exceptions, for which the NLC applied to the ZBA in March 2018. On May 17, 2018, the ZBA held a hearing on the NLC's application. Stephen Pascal and Chris Gates (collectively, "Appellants") attended the hearing to oppose the NLC's requests. At the end of the hearing, the ZBA Chairperson stated that the parties could submit proposed findings of fact and conclusions of law for up to two weeks after the hearing transcript was available. On June 12, 2018, counsel for both parties filed their proposed findings of fact and conclusions of law.

On July 27, 2018, forty-five days after counsel submitted their proposed findings of fact, counsel for the NLC consented in writing to extend the time for the ZBA to reach a decision until at least August 9, 2018. The NLC's counsel agreed in writing to two additional extensions, from August 9 to August 16, and from August 16 to August 23. The ZBA ultimately granted the NLC's application on August 23, subject to certain conditions. Notably, ZBA member Burton-Faulk voted to grant the NLC's application even though she was also a member of the NLC's board of directors.[2]

Appellants appealed the ZBA's decision to the Court of Common Pleas. Relevant to this appeal, Appellants argued that the ZBA's decision should be overturned because

---

[2] This fact was unknown during the pendency of the proceeding before the ZBA, and it was only a mere allegation on appeal to the lower courts. However, in granting *allocatur*, this Court directed the parties to stipulate, if possible, regarding Burton-Faulk's dual role during the ZBA proceeding. *Pascal v. City of Pittsburgh Zoning Bd. of Adjustment*, 240 A.3d 104 (Pa. 2020) (*per curiam*). In response, the parties stipulated as follows: "LaShawn Burton-Faulk was a board member of the [NLC] from the time of the [ZBA] proceedings on May 17, 2018[,] until the date the [ZBA] rendered its decision on August 23, 2018." Appellants' Br. Ex. C.

(1) it failed to issue the decision within forty-five days of the hearing as required by the Code and (2) Burton-Faulk's failure to recuse herself rendered the ZBA's decision void.

The trial court affirmed without taking additional evidence. It found that the ZBA's decision was timely because the NLC, pursuant to the Code, consented to all extensions of time. The trial court failed to discuss whether Burton-Faulk's alleged conflict of interest rendered the ZBA's decision invalid. Appellants timely appealed to the Commonwealth Court. They argued, among other things, that the ZBA's decision should be voided in light of Burton-Faulk's conflict of interest in the proceeding and the fact that the decision was untimely.

In a unanimous memorandum, the Commonwealth Court affirmed.[3] First, the court found that the ZBA's decision was timely—*i.e.*, that it was issued within forty-five days of when the record was closed—because the "ZBA clearly left the record open until two weeks after the hearing transcript became available."[4] Moreover, before the forty-five days had elapsed, the NLC's counsel agreed in writing to extend the filing period of the ZBA's decision.[5] Because the NLC timely agreed in writing to multiple extensions of time, a deemed denial was not mandated by the Code.[6] Thus, according to the Commonwealth Court, the trial court did not err when it affirmed the ZBA's grant of zoning relief since the ZBA issued a timely written decision.

Second, the court held that, although Burton-Faulk may have had a conflict of interest in the NLC's application and failed to recuse herself from the hearing, her possible

---

[3] *Pascal v. City of Pittsburgh Zoning Bd. of Adjustment*, 496 CD 2019, 2020 WL 973340 (Pa. Cmwlth. Feb. 28, 2020).

[4] *Id.* at *3.

[5] *Id.*

[6] *Id.* (citing PITTSBURGH ZONING CODE §§ 922.07.C, 922.09.D).

disqualification did not, in and of itself, require invalidation of the ZBA's decision. The court reiterated that reversal is not required without evidence that the conflict of interest "'controlled or unduly influenced the other members . . . in any manner which would raise doubts as to the validity of *their* votes.'"[7] Thus, without evidence that Burton-Faulk controlled or unduly influenced the votes of the other ZBA members, Burton-Faulk's possible disqualification did not require reversal of the ZBA's decision.

Appellants sought allowance of appeal in this Court. We granted review to consider the timeliness of the ZBA's decision and Burton-Faulk's conflict of interest.

## II.

The Majority holds that the ZBA's decision was timely because the unambiguous provisions of the Code governing its decision deadlines, when read together, "evince the intent of the drafters to allow an agreed-upon extension of time for creating the record at ZBA proceedings, before the ZBA's decision must be rendered."[8] The Majority also notes that "the procedure posted on the ZBA website, stating the ZBA decision will be rendered within 45 days after the record is closed, is clearly aligned with the Code, which expressly permits an applicant to agree on the record to an extension of time."[9] Finally, because the parties implicitly acquiesced on the record at the close of the hearing "to keep the record open until two weeks after the hearing transcript became available, so that they could draft their respective findings of fact and conclusions of law," the Majority concludes that the clock did not start to run on the ZBA's decision until that later date.[10]

---

[7] *Id.* at *4 (quoting *Borough of Youngsville v. Zoning Hearing Bd. of Youngsville*, 450 A.2d 1086, 1091 (Pa. Cmwlth. 1982) (emphasis in original)).

[8] Maj. Op. at 7.

[9] *Id.*

[10] *Id.*

Although courts occasionally defer to municipalities' interpretations of their ordinances, "this principle applies where the precise meaning of the contested provisions is uncertain, and not where they are clear and explicit in their language."[11] Thus, absent ambiguity, "procedural provisions of zoning statutes must be rigidly adhered to."[12] Here, the Code provides:

> *After the public hearing, the Board shall act . . . within forty-five (45) days of the Board hearing.* Where the Board fails to render its decision within the period required by this subsection . . . the decision shall be deemed to have been rendered in denial of the application unless the applicant has agreed in writing or on the record to an extension of time.[13]

The Code also provides: "The Board shall adopt and maintain rules of procedure not inconsistent with the provisions of this Code."[14]

> Notwithstanding these provisions of the Code, the ZBA's website stated:
>
> In many cases, the record will be closed after the hearing has completed. For in-depth cases or appeals with considerable opposition, the ZBA may allow proposed Findings of Fact and Conclusions of Law to be submitted by each party. Typically, the ZBA allows two or three weeks after the hearing for these to be submitted, at which point the record will then be closed.
>
> After the record is closed, the ZBA will issue a decision within 45 days.[15]

The ZBA Chairperson, in accordance with this procedure, stated at the close of the hearing:

---

[11]    *Broussard v. Zoning Bd. of Adjustment of City of Pittsburgh*, 907 A.2d 494, 500 (Pa. 2006).

[12]    *Relosky v. Sacco*, 523 A.2d 1112, 1116 (Pa. 1987); *accord* 1 Pa.C.S. § 1921(b) ("When the words of a statute are clear and free from all ambiguity, the letter of it is not to be disregarded under the pretext of pursuing its spirit.").

[13]    PITTSBURGH ZONING CODE §§ 922.07.C, 922.09.D (emphasis added).

[14]    *Id.* § 923.02.C.1.

[15]    R.R. at 369a.

But we do want to have legal positions presented by any and all who want to, and we're going to give you two weeks from the transcript to do that.

So whenever the transcript is ready, we'll take two weeks after that, and then that is flexible, based on the transcript's availability . . . .

There's two counsel here who can exchange information without another. If there are extensions one way or another that are needed, we'll entertain those requests.[16]

This announcement was greeted with silence from the parties,[17] yet we know that the parties performed in accordance with the procedure outlined by the Chairperson. However, there was no agreement, either implicit or explicit, that leaving the record open would, contrary to the Code, delay the start of the forty-five day decision deadline.[18]

It may be true, as the ZBA suggests, that leaving the record open for a time after a hearing to facilitate parties' submissions makes "good practical sense."[19] But this procedure delays the start of the forty-five day period in which the ZBA must act. As such, this contravenes the plain language of Sections 922.07.C and 922.09.D of the Code, which make no provision for the ZBA's preferred procedure. The Code's silence cannot be ignored.[20] On the contrary, Sections 922.07.C and 922.09.D mandate that the ZBA issue a decision within forty-five days of the *hearing*, not the close of the record. Section 923.02.C.1 of the Code expressly forbids adoption by the ZBA of procedures that are inconsistent with the provisions of the Code. Because the Code identifies the date of the

---

[16]    Notes of Testimony, 05/17/2018, at 48 (R.R. at 095a).

[17]    *Id.*

[18]    *See id.*

[19]    *See* ZBA's Br. at 15.

[20]    *See Sivick v. State Ethics Comm'n*, 238 A.3d 1250, 1264 (Pa. 2020) ("[A]lthough one is admonished to listen attentively to what a statute says, one must also listen attentively to what it does not say.") (cleaned up).

hearing as the pertinent date, whereas the ZBA's website identifies the date of the close of the record, the Code, per Section 923.02.C.1, must prevail over the inconsistent procedure on the ZBA's website.

Nonetheless, the Majority sanctions the ZBA's practice of issuing its decisions within forty-five days of the close of the record, thereby engrafting an exception to the timeliness requirement of Sections 922.07.C and 922.09.D under the guise of a plain language reading. This is impermissible.[21] If the ZBA genuinely needs more leeway in issuing its decisions such that the forty-five day deadline starts to run when the record is closed and not at the end of the hearing, then the Code should be amended accordingly. However, this issue is properly addressed to the Pittsburgh City Council, not this Court.

Properly calculated, the forty-five day period commenced after the hearing on May 17, 2018, and not the close of the record on June 12, 2018. Thus, the ZBA was required to issue its decision by July 2, 2018. Since no decision was issued on July 2, and the NLC's first agreement to an extension came three and one half weeks later, the ZBA's decision was untimely and the NLC's application should be deemed denied.

**III.**

While I depart from the Majority on the timeliness issue, I join the Majority with regard to Burton-Faulk's conflict of interest. One of the central tenets of our legal system is the right to a fair tribunal, without which the pursuit of all other rights would be a pantomime of justice. All the procedural and evidentiary safeguards of a fair trial mean nothing if the outcome is a *fait accompli* or irremediably tainted by some bias or

---

[21] *See In re Fortieth Statewide Investigating Grand Jury*, 197 A.3d 712, 721 (Pa. 2018) ("[O]ur Court may not usurp the province of the legislature by rewriting [a statute] to add . . . requirements that . . . do not comport with the [statute] itself . . . .").

prejudgment on the part of the decision-maker.[22]  This is precisely the dilemma Appellants faced once they learned of Burton-Faulk's conflict of interest.

The Due Process Clause of the Fourteenth Amendment to the United States Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law."[23]  This language has been interpreted to protect against, among other things, procedures so unfair that they offend "fundamental conceptions of justice which lie at the base of our civil and political institutions and which define the community's sense of fair play and decency."[24]  That said, the process due in a given situation is a question without an easy answer.  Due process "is not a technical conception with a fixed content unrelated to time, place and circumstance."[25]  Rather, "due process is flexible and calls for such procedural protections as the particular situation demands."[26]  Although amoeba-like in its contours, procedural due process does not yield to scrutiny under a microscope.

---

[22]      Such a situation calls to mind Joseph K.'s ordeal:

> There were dark hours . . . in which you thought you had achieved nothing at all, in which it seemed to you that only the cases predestined from the start to succeed came to a good end, which they would have reached in any event without your help, while every one of the others was doomed to fail in spite of all your maneuvers, all your exertions, all the illusory little victories on which you plumed yourself.

FRANZ KAFKA, THE TRIAL 133 (Willa Muir & Edwin Muir trans., Everyman's Library 1992) (1925).

[23]      U.S. CONST. amend. XIV, § 1.

[24]      *Dowling v. United States*, 493 U.S. 342, 353 (1990) (cleaned up).

[25]      *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 162 (1951) (Frankfurter, J., concurring).

[26]      *Morrissey v. Brewer*, 408 U.S. 471, 481 (1972).

Notwithstanding the many forms due process can take, one of the hallmarks of procedural due process is a "fair trial in a fair tribunal."[27] This guarantee extends to administrative proceedings like the one before the ZBA here.[28] The mechanism that ensures a fair tribunal is the recusal of a conflicted decision-maker. After all, it is axiomatic that "[n]o man is allowed to be a judge in his own cause, because his interest would certainly bias his judgment, and, not improbably, corrupt his integrity."[29] However, "most matters relating to judicial disqualification do not rise to a constitutional level."[30]

---

[27] *In re Murchison*, 349 U.S. 133, 136 (1955).

[28] *See Withrow v. Larkin*, 421 U.S. 35, 46 (1975) ("[A] fair trial in a fair tribunal is a basic requirement of due process. This applies to administrative agencies which adjudicate as well as to courts.") (cleaned up).

[29] JAMES MADISON, *The Federalist No. 10*, *in* WRITINGS 160, 162 (Jack N. Rakove ed., The Library of America 1999) (1787).

[30] *Caperton v. A.T. Massey Coal Co.*, 556 U.S. 868, 876 (2009) (cleaned up). This caveat identifies a significant tension within the law of recusal. As this Court has observed:

> Due consideration should be given by [the judge] to the fact that the administration of justice should be beyond the appearance of unfairness. But while the mediation of courts is based upon the principle of judicial impartiality, disinterestedness, and fairness pervading the whole system of judicature, so that courts may as near as possible be above suspicion, there is, on the other side, an important issue at stake; that is, that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice or unfairness made against the judge in the trial of a cause. It is of great importance to the administration of justice that such should not occur.

*In re Crawford's Estate*, 160 A. 585, 587 (Pa. 1931). The competing values identified in *Crawford's Estate* suggest an impasse. If disqualification was no hurdle at all, needless delay and discontent would ensue as decision-makers were disqualified left and right. Conversely, if disqualification proved a herculean task, adjudications might be timely but unjust. The Constitution navigates this Scylla and Charybdis by taking a restrained view of disqualification. "The Due Process Clause demarks only the outer boundaries of judicial disqualifications." *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986). Thus, state constitutions, statutes, and codes of conduct may provide more protection.

On one hand, the Due Process Clause encompasses the common-law rule that a decision-maker must recuse herself when she has a direct pecuniary interest in a case.[31] Over the last century, however, the Supreme Court of the United States has gradually expanded the grounds for recusal far beyond what the common law required. The first inklings of a departure from the common law came in *Tumey v. Ohio*.[32] In *Tumey*, state and local laws allowed the mayor of a town, who also served as the town's justice of the peace, to try cases involving violations of Ohio's Prohibition Act and to fine those convicted. Half of the money collected from the fines went to the town's treasury, and the mayor also received $12 for each conviction. The mayor and the town received nothing in the event of an acquittal. On appeal, the Supreme Court held that this scheme violated due process "because of [the mayor's] direct pecuniary interest in the outcome, and because of his official motive to convict and to graduate the fine to help the financial needs of the village."[33] Despite the mayor's pecuniary interest, the Supreme Court based its holding on an objective, non-pecuniary recusal standard:

> Every procedure which would offer a possible temptation to the average man as a judge to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear, and true between the state and the accused denies the latter due process of law.[34]

The Supreme Court refined the holding of *Tumey* some years later in *In re Murchison*. There, a trial judge questioned two witnesses in an initial proceeding to

---

[31] *See generally* John P. Frank, *Disqualification of Judges*, 56 YALE L.J. 605, 609-12 (1947) (discussing the common-law origins of judicial recusal).

[32] 273 U.S. 510 (1927). The Supreme Court remarked that the due process violation in *Tumey* "was less than what would have been considered personal or direct at common law." *Caperton*, 556 U.S. at 877.

[33] *Tumey*, 273 U.S. at 535.

[34] *Id.* at 532.

determine whether criminal charges should be brought. In other words, the judge acted as a "one-man grand jury." One of the witnesses answered the judge's questions, but the judge found him untruthful and charged him with perjury. The other witness declined to answer, and the judge held him in contempt. The judge then tried and convicted both men in a second proceeding. The defendants appealed, and the Supreme Court set aside their convictions. Although the Court recognized that the recusal standard was imprecise, it nonetheless held that, "[h]aving been a part of that [one-man grand jury] process[,] a judge cannot be, in the very nature of things, wholly disinterested in the conviction or acquittal of those accused."[35] Invoking James Madison's famous dictum, the Court set forth the following recusal standard:

> Fairness of course requires an absence of actual bias in the trial of cases. But our system of law has always endeavored to prevent even the probability of unfairness. To this end no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome. That interest cannot be defined with precision. Circumstances and relationships must be considered.[36]

The Court conceded that such a "stringent" rule may be over-inclusive, barring judges who bear no actual bias, but, "to perform its high function in the best way[,] justice must satisfy the appearance of justice."[37]

Similarly, in *Mayberry v. Pennsylvania*,[38] the Supreme Court addressed whether a trial judge tasked with sentencing a defendant may also preside over the same defendant's criminal contempt charges for contemptuous conduct directed at the same trial judge. There, a *pro se* defendant engaged in "brazen efforts to denounce, insult, and

---

[35]    *Murchison*, 349 U.S. at 137.

[36]    *Id.* at 136.

[37]    *Id.* (cleaned up).

[38]    400 U.S. 455 (1971).

slander the court and to paralyze the trial."[39]  Indeed, he lobbed "downright insults" against the trial judge and employed "tactics taken from street brawls."[40]  Accordingly, in addition to being sentenced on the underlying charges for which he was convicted, the judge also pronounced the defendant guilty of multiple instances of criminal contempt.  On appeal, the Supreme Court acknowledged that not every attack on a judge disqualifies her from presiding, but noted that most of the attacks leveled against the judge were "highly personal aspersions, even 'fighting words'—'dirty sonofabitch,' 'dirty tyrannical old dog,' 'stumbling dog,' and 'fool.'  [The judge] was charged with running a Spanish Inquisition and told to 'Go to hell' and 'Keep your mouth shut.'"[41]  Given the severity of the defendant's insults, the Court found that they were "apt to strike at the most vulnerable and human qualities of a judge's temperament."[42]  "No one so cruelly slandered is likely to maintain that calm detachment necessary for fair adjudication."[43]  Consequently, the defendant's contempt charges should have been tried "before a judge other than the one reviled by the contemnor."[44]

The Supreme Court further cemented the link between due process and recusal in *Aetna Life Insurance Co. v. Lavoie*.  In *Lavoie*, Justice Embry of the Alabama Supreme Court cast the deciding vote to uphold a punitive damages award against an insurance company for its bad-faith refusal to pay a claim.  Meanwhile, Justice Embry was the lead plaintiff in a similar bad-faith refusal to pay lawsuit pending before Alabama's lower courts.

[39]     *Id.* at 462.

[40]     *Id.*

[41]     *Id.* at 466.

[42]     *Id.* (cleaned up).

[43]     *Id.* at 465.

[44]     *Id.* at 466.

Notably, Alabama law in this area was unsettled at the time. Consequently, when Justice Embry cast the deciding vote and authored the majority opinion, "he did not merely apply well-established law" but "quite possibly made new law."[45] Moreover, Justice Embry and his colleagues in the majority refused to set aside as excessive a punitive damages award of $3.5 million, although the largest punitive award previously affirmed by the court was $100,000. Accordingly, Justice Embry's deciding vote "undoubtedly 'raised the stakes'" for the insurance company in his own suit.[46] His opinion "had the clear and immediate effect of enhancing both the legal status and the settlement value of his own case."[47] In this respect, Justice Embry had a "direct, personal, substantial, and pecuniary" interest in the outcome and essentially "acted as a judge in his own case."[48] Thus, Justice Embry's participation violated due process.

Recently, in *Williams v. Pennsylvania*,[49] the Supreme Court analyzed whether the participation of former Chief Justice Castille in this Court's review of Terrance Williams' collateral appeal violated due process. As the District Attorney of Philadelphia, Chief Justice Castille had authorized his deputies to pursue the death penalty at Williams' murder trial. Subsequently, as a member of this Court, he declined to recuse himself from Williams' appeals. The Supreme Court determined that Chief Justice Castille's failure to recuse created "an impermissible risk of actual bias" due to his "significant, personal involvement as a prosecutor in a critical decision regarding the defendant's

---

[45]     *Lavoie*, 475 U.S. at 822.

[46]     *Id.* at 823-24.

[47]     *Id.* at 824.

[48]     *Id.* (cleaned up).

[49]     ___ U.S. ___, 136 S. Ct. 1899 (2016).

case."[50]  Simply put, the Court announced a narrow but clear-cut rule: a judge may not review those convictions in which she had a significant, personal role in securing as a prosecutor.  Due process requires recusal in such circumstances because "the likelihood of bias on the part of the judge is too high to be constitutionally tolerable."[51]  This is true whether or not the judge cast the deciding vote as part of a multi-member body.[52]

In light of this survey of the decisional law regarding recusal and due process, it is most troubling that Burton-Faulk served simultaneously on the NLC's board of directors and as a member of the ZBA panel reviewing the NLC's application.  Despite this blatant conflict of interest, Burton-Faulk failed to recuse herself.  While her participation did not involve a direct pecuniary interest like those in *Tumey* and *Lavoie*, Burton-Faulk nonetheless commingled her adjudicatory function as a ZBA member reviewing the NLC's application with her vested interest in having the application approved as a member of the NLC's board of directors.  Indeed, Burton-Faulk's vote to grant the NLC's application had the clear and immediate effect of facilitating the NLC's development project and enhancing the value of the subject properties.  We can never know if Burton-Faulk harbored actual bias in deciding the NLC's application, but the Due Process Clause does not require such knowledge.  Rather, Burton-Faulk's participation alone constitutes a fatal structural error that undermines the entire ZBA proceeding.  Whether framed as "the probability of unfairness" or "the likelihood of bias," Burton-Faulk's conflict of interest is the kind that strikes at the most vulnerable and human qualities of a decision-maker's temperament.  Just as the judge in *Mayberry* was unlikely "to maintain that calm

---

[50]     *Id.* at 1905.

[51]     *Id.* at 1903 (cleaned up).

[52]     *Id.* at 1909 ("[A]n unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote.").

detachment necessary for fair adjudication,"[53] Burton-Faulk likewise lacked the requisite impartiality to decide the NLC's application. It strains credulity to suggest otherwise given her significant, personal involvement in the NLC's affairs. Burton-Faulk likely had intimate knowledge of the case that unbalanced her ability to weigh the evidence and assess the strengths and weaknesses of the parties' arguments. The possibility that such unbalancing occurred suffices to impugn her judgment. Accordingly, Burton-Faulk's dual role, based upon all objective and reasonable perceptions, tainted the ZBA proceeding with a constitutionally intolerable amount of potential bias.[54]

Furthermore, it should have been obvious to the Commonwealth Court that its decision in *Borough of Youngsville v. Zoning Hearing Board of Youngsville* was no longer tenable post-*Williams*. Even one member of a multi-member judicial or quasi-judicial body can taint that entire body's decision. As the Supreme Court observed:

> The deliberations of an appellate panel, as a general rule, are confidential. As a result, it is neither possible nor productive to inquire whether the jurist in question might have influenced the views of his or her colleagues during the decisionmaking process. . . .
>
> \* \* \* \*
>
> A multimember court must not have its guarantee of neutrality undermined, for the appearance of bias demeans the reputation and integrity not just of one jurist, but of the larger institution of which he or she is a part.[55]

---

[53]     *Mayberry*, 400 U.S. at 465.

[54]     *Cf. Commonwealth v. Fears*, 250 A.3d 1180, 1206 (Pa. 2021) (Opinion in Support of Reversal) ("Viewed objectively, a judge whose conduct suggests an impermissible potential for bias for against any party, whether due to pecuniary interests or other potential prejudices, must recuse from any case involving that party.").

[55]     *Williams*, 136 S. Ct. at 1909.

One is reminded of the maxim about bad apples and bushels. Yet, as the Supreme Court notes, the decision-making process of a multi-member body is a black box.[56] This secrecy, indispensable to proper adjudication,[57] stymies any insight into the nature of the body's deliberations, such as learning whose argument carried the day and, thus, swayed the body as a whole. Therefore, requiring parties before the ZBA, or any other body, to show that a conflicted member "controlled or unduly influenced the other members . . . in any manner which would raise doubts as to the validity of *their* votes,"[58] is irreconcilable with *Williams*.[59] So long as courts are unwilling to open judicial and quasi-judicial deliberative processes to discovery, litigants would, as a practical matter, confront the

---

[56] *See id.*; *see also Lavoie*, 475 U.S. at 831 (Brennan, J., concurring) ("[W]hile the influence of any single participant in [an appellate court's deliberative] process can never be measured with precision, experience teaches us that each member's involvement plays a part in shaping the court's ultimate disposition."); Arthur Selwyn Miller & D.S. Sastri, *Secrecy and the Supreme Court: On the Need for Piercing the Red Velour Curtain*, 22 BUFF. L. REV. 799, 803 (1973) ("Judges seldom reveal publicly why a major premise was chosen while other available premises were discarded. The unavoidable conclusion is that there is more to adjudication than what the judges choose to say, either in their opinions or in their extrajudicial utterances.").

[57] Justice Frankfurter once wrote:

> The secrecy that envelops the Court's work is not due to love of secrecy or want of responsible regard for the claims of a democratic society to know how it is governed. That the Supreme Court should not be amenable to the forces of publicity to which the Executive and the Congress are subjected is essential to the effective functioning of the Court.

Felix Frankfurter, *Mr. Justice Roberts*, 104 U. PA. L. REV. 311, 313 (1955); *see also Williams*, 136 S. Ct. at 1909 ("[O]ne purpose of judicial confidentiality is to assure jurists that they can reexamine old ideas and suggest new ones, while both seeking to persuade and being open to persuasion by their colleagues.").

[58] *Youngsville*, 450 A.2d at 1091 (emphasis in original).

[59] *Cf. Commonwealth v. Koehler*, 229 A.3d 915, 933-34 (Pa. 2020) ("[T]he remedy for demonstrating that an appellate tribunal included a jurist with an unconstitutional likelihood of bias would be a new appeal to that tribunal without the participation of the partial jurist.").

near-impossible task of divining what undue influence, if any, a conflicted decision-maker exerted on another. Fortunately, the Due Process Clause does not require the kind of telepathy contemplated by the *Youngsville* court.

We are told that the government of the United States is "a government of laws, and not of men."[60] While Chief Justice Marshall's formulation of "the rule of law" remains as true today as it was more than two centuries ago, it is equally true to say that, then as now, laws do not write, enforce, or interpret themselves. These responsibilities fall to flesh-and-blood people, who are by no means immune to the same foibles that circulate in the general public. But what may be acceptable or harmless in a workaday setting can be fatal in the law if left unchecked. "Both the appearance and reality of impartial justice are necessary to the public legitimacy of judicial pronouncements and thus to the rule of law itself."[61] Whether judicial or quasi-judicial, a decision-maker's position is a public trust, and, as with any trustee, they are "held to something stricter than the morals of the market place. Not honesty alone, but the punctilio of an honor the most sensitive, is then the standard of behavior."[62] Therefore, it is incumbent upon all decision-makers to implement and adhere to the most rigorous recusal practices.[63] Unfortunately, that probity was missing here.

---

[60] *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 163 (1803).

[61] *Williams*, 136 S. Ct. at 1909; *see also* WILLIAM SHAKESPEARE, MEASURE FOR MEASURE act 2, sc. 2, ll. 213-14 ("Thieves for this robbery have authority / When judges steal themselves.").

[62] *Meinhard v. Salmon*, 164 N.E. 545, 546 (N.Y. 1928).

[63] The umpire theory of decision-making so prevalent today has a certain analytical and rhetorical appeal. *See generally* Brett M. Kavanaugh, *The Judge as Umpire: Ten Principles*, 65 CATH. U. L. REV. 683 (2016). But the sporting analogy suggests a mechanical process that ignores the fact that decision-makers "are incurably human and that their background and personality affect all their thinking and therefore their decisions." Jerome Frank, *Are Judges Human?*, 80 U. PA. L. REV. 17, 24 (1931). To that

Justice Todd and Justice Donohue join this concurring and dissenting opinion.

---

end, effective recusal practices require great humility on the decision-maker's part since "[b]ias is easy to attribute to others and difficult to discern in oneself." *Williams*, 136 S. Ct. at 1905. Thus, whenever a decision-maker determines that a situation warrants her recusal, it is a commendable display of the highest integrity and introspection.