[J-78-2019] [MO: Wecht, J.]

# IN THE SUPREME COURT OF PENNSYLVANIA
## EASTERN DISTRICT

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 768 CAP |
| | : | |
| Appellee | : | Appeal from the Order dated June |
| | : | 29, 2018 in the Court of Common |
| | : | Pleas, Bradford County, Criminal |
| v. | : | Division at No. CP-08-CR-0000309- |
| | : | 1995. |
| | : | |
| JOHN JOSEPH KOEHLER, JR., | : | SUBMITTED:  July 19, 2019 |
| | : | |
| Appellant | : | |

## CONCURRING AND DISSENTING OPINION

**JUSTICE DOUGHERTY**                    **DECIDED:  April 24, 2020**

In one fell swoop, the Majority today implicitly constitutionalizes, as a matter of federal law, collateral attacks alleging only the appearance of judicial bias; permits inferior courts to meddle into administrative and supervisory functions over which this Court possesses exclusive authority; endorses the policing of alleged violations of the Code of Judicial Conduct in post-conviction proceedings; and authorizes lower courts to unilaterally undo this Court's prior published decisions.  The flaws of the Majority's opinion are flagrant and many.  It significantly misstates and expands the applicable federal law. It divests this Court of powers granted exclusively to it by the Pennsylvania Constitution and held in trust for the people.  It subjects former and sitting jurists to post-hoc accusations of wrongdoing by disaffected litigants, making them vulnerable to unwarranted ridicule.  And it inverts the constitutionally-defined judicial hierarchy in this Commonwealth and casts doubt upon the continued viability of an untold number of our prior published opinions.  Worst of all, it does all of this despite the fact that we presently

lack jurisdiction to decide the hypothetical and unripe question the Majority is so eager to reach.  For these reasons, I emphatically dissent.

## I. Background

The Majority appropriately recounts the factual and procedural background of this matter.  *See* Majority Opinion at 1-10.  To summarize, in 1996, a jury convicted appellant, a self-proclaimed hit man for the mob, of two counts of first-degree murder and related offenses after he directed an 18-year-old man to kill appellant's girlfriend and her nine-year-old son as part of the young man's recruitment into the profession.  After the jury returned two sentences of death, this Court affirmed the judgment of sentence on direct review.  *Commonwealth v. Koehle*r, 737 A.2d 225 (Pa. 1999) ("*Koehler I*"), *cert. denied*, 531 U.S. 829 (2000).

In 2001, appellant filed a timely PCRA petition alleging, as relevant here, that his penalty-phase counsel was ineffective for failing to investigate and present mitigation evidence demonstrating he "had a history of family abuse and neglect[.]"  *Commonwealth v. Koehler*, 36 A.3d 121, 147 (Pa. 2012) ("*Koehler II*").  The PCRA court denied relief following an evidentiary hearing.  In 2012, this Court affirmed that ruling in an opinion authored by Justice Baer and joined in full by Justice Todd, former Chief Justice Castille, and former Justices Eakin, McCaffery, and Orie Melvin.  Then-Justice Saylor authored a partially joining concurring opinion.  Notably, in rejecting appellant's mitigation-based ineffectiveness claim, the Court acknowledged appellant's witnesses' PCRA testimony "contained much more detail and painted a clearer picture of [a]ppellant's unfortunate childhood[,]" but nevertheless held that it "pale[d] in comparison with the aggravating circumstances found by the jury."  *Id.* at 151.  The Court concluded:  "the mitigation evidence of [a]ppellant's unfortunate childhood is clearly outweighed by the aggravating

circumstance of senseless multiple murders of two innocent victims in a bizarre exercise to train another individual to become an assassin." *Id.* at 151-52.

Nearly four years later, on December 7, 2015, appellant filed a second, facially untimely PCRA petition. Therein, he asserted he "seeks a new PCRA appeal in the wake of the extraordinary revelation that during the pendency of [*Koehler II*], [former] Justice [J.] Michael Eakin sent and received emails demonstrating a disregard for domestic violence victims." PCRA Petition, 12/7/2015, at i. In this regard, appellant explained:

> On or about October 8, 2015, an on-line article appeared in philly.com reporting that the news outlet had come into possession of a number of emails sent by, or received from, Justice Eakin through a 'private' Yahoo.com inbox that he had set up under the alias 'John Smith.' The article reported that 'Eakin's email address repeatedly appears within a network of law-enforcement officials who received inappropriate emails on their government accounts,' and then describes named and unnamed judges, prosecutors (including prosecutors from the Attorney General's Office) and police officials as either recipients or senders of various racist, sexist and culturally insensitive emails and attachments.

*Id.* at 11 (citations omitted). More specifically, appellant pointed to the article's description of "[a]n email sent by Eakin containing a 'joke' about a woman complaining to a doctor that her husband 'beats me to a pulp,' to which the doctor recommends that she 'swish tea in her mouth' and not 'swallow' until her husband is asleep, concluding: 'You see how much keeping your mouth shut helps?'" *Id.* at 12 (citation omitted).[1]

---

[1] The Court of Judicial Discipline, which concluded in 2016 that Justice Eakin violated former Canon 2A of the of the Code of Judicial Conduct, and derivatively, violated Article V, §17(b) of the Pennsylvania Constitution, provided a more detailed description of the email in question as follows:

> An e-mail bearing the subject line "Marital advice," sent Tuesday, July 6, 2010, at 1:20 p.m.

> This e-mail contains text that states the following: "A woman goes to the doctor, beaten black and Blue.

> Doctor: 'What happened?'

In appellant's view, "[g]iven the 'joke' generated by Justice Eakin regarding spousal abuse, [appellant]'s claim [in his 2001 PCRA petition] regarding counsel's failure to develop and present evidence of [appellant]'s family dysfunction including spousal abuse could not have received a fair review from Justice Eakin." *Id.*; *see also id.* at i ("Because [appellant]'s mitigation claim was based on him both witnessing and being a victim of domestic violence and abuse, Justice Eakin's exchange of emails reflecting a dismissive attitude about domestic violence raises a serious risk of actual bias[.]"). Observing that the Code of Judicial Conduct "protects litigants where there may be a risk of impartiality[,]" *see id.* at 15, appellant averred he "has established at a minimum that Justice Eakin's participation in [*Koehler II*] violated Due Process on the basis of the appearance of bias and, following full discovery and an evidentiary hearing, [appellant] expects to demonstrate the presence of an actual bias requiring relief." *Id.* at 18.[2] In his closing

> Woman: 'Doctor, I don't know what to do.
>
> Every time my husband comes home drunk he beats me to a pulp.'
>
> Doctor: 'I have a real good medicine for that. When your husband comes home drunk, just take a glass of sweet tea and start swishing it in your mouth. Just swish and swish but don't swallow until he goes to bed and is asleep.'
>
> Two weeks later the woman comes back to the doctor looking fresh and reborn.
>
> Woman: 'Doctor that was a brilliant idea! Every time [m]y husband came home drunk, I swished that sweet tea. I swished and swished, and he didn't touch me!'
>
> Doctor: 'You see how much keeping your mouth shut helps?'

*In re Eakin*, 150 A.3d 1042, 1070 (Pa. Ct. Jud. Disc. 2016).

[2] Subsequently, on November 7, 2016, appellant filed a motion for discovery wherein he more pointedly alleged, "Justice Eakin's exchange of offensive and inappropriate emails amounted to a potential violation of the Code of Judicial Conduct." Motion for Discovery, 11/7/2016, at 17-18. With respect to the scope of his discovery request, appellant submitted that he "is entitled to a complete accounting of the [Office of Attorney General]'s

request for relief, and in seeming tension with his initial, more limited request for "a new PCRA appeal," appellant broadly asked that his "convictions and death sentence be vacated, and a new trial and/or sentencing be ordered, post-conviction proceedings reopened, or such further relief as the Court deems appropriate." *Id.* at 21.

The PCRA court was understandably circumspect about its jurisdiction to entertain appellant's judicial bias claim, as well as its authority to grant the requested relief. *See* PCRA Ct. Order, 6/26/2016, at 1 (concluding appellant's request that the PCRA court declare Justice Eakin "engaged in judicial misconduct, or that he should have recused [from participating in *Koehler II*] . . . is beyond the original jurisdiction and authority of this court"). Operating under the belief that only this Court could entertain appellant's claim, the PCRA court transferred the matter to this Court. However, after accepting briefing from the parties concerning our jurisdiction to hear the matter in the first instance, on November 2, 2016, we remanded the case back to the PCRA court. In so doing, we cited

---

email correspondence with Supreme Court justices so that he can definitively determine the scope of the constitutional violation." *Id.* at 20; *see also id.* (seeking "to review the universe of inappropriate emails"). Appellant also sought the compelled production of any emails the OAG provided to the special counsels that investigated the email scandal, and all evidence provided to the Judicial Conduct Board. *See id.* at 20-21. According to appellant, this production is necessary so he can personally sort out "what was provided to whom and when[,]" since, he alleges, "the Judicial Conduct Board, the reports of [the] special counsel, and the OAG have all made contradictory statements as to whether and at what point the OAG disclosed the emails relating to Justice Eakin[.]" *Id.* at 20-21. Appellant also suggests he is entitled to review the emails to "determine if there were any case-related communications between the [OAG] and the justices of [this Court,]" *id.* at 21, even though the Court of Judicial Discipline has already found as fact that "[n]one of the e-mails . . . were related to matters pending before the Supreme Court or involve the business of the Judiciary of Pennsylvania." *In re Eakin*, 150 A.3d at 1049. Notwithstanding these assertions by appellant, the Court of Judicial Discipline concluded Justice Eakin's conduct did not "prejudice the proper administration of justice[,]" nor did the Judicial Conduct Board allege "that judicial decisions were made for or influenced by improper reasons." *Id.* at 1060; *see also id.* (Justice Eakin "presented credible witnesses that his judicial opinions were not reflective of any of the biases expressed in any of the emails, but instead were decided, in each case, in accordance with the facts and law").

only 42 Pa.C.S. §9545(a) ("Original jurisdiction over a proceeding under this subchapter shall be in the court of common pleas."), and made no further observations beyond that threshold jurisdictional matter. *Commonwealth v. Koehler*, 160 A.3d 782 (Pa. 2016) (*per curiam*).

The parties engaged in additional briefing upon remand; appellant also sought leave to amend his PCRA petition and filed a motion for discovery. *See supra*, n.2. Thereafter, on December 28, 2017, the PCRA court issued notice of intent to dismiss the petition without a hearing pursuant to Pa.R.Crim.P. 907. The PCRA court acknowledged it previously erred in transferring the matter to this Court, candidly explaining it failed "to observe the distinction between a court's competency to enter on the inquiry and its power to grant the requested relief." Rule 907 Notice, 12/28/2017, at ¶6, *citing Alpha Tau Omega Fraternity v. Univ. of Pa.*, 464 A.2d 1349, 1353 (Pa. Super. 1983) ("[C]ase law in Pennsylvania distinguishes between the competency of the court to act and whether it is able to grant the requested relief once it assumes jurisdiction."). But even though the PCRA court conceded it was competent to act on appellant's petition, it remained steadfast in its determination that, as an inferior court, it "is powerless to conclude that Justice Eakin demonstrated bias, or that he violated the Code of Judicial Conduct, or that he should have recused himself from consideration of [*Koehler II*]." *Id.* at ¶7; *see also id.* at ¶10 ("The relief [appellant] seeks here is beyond this court's power."). Consequently, the PCRA court dismissed the petition on June 28, 2018. This appeal followed.

## II. Analysis

The primary issue in this appeal involves "a question of immense constitutional significance: whether a lower court possesses authority to order a higher tribunal to rehear an appeal where a defendant alleges that a constitutional error — in this case, a due process claim predicated on supposed judicial bias — occurred during [a prior]

appellate process." *Commonwealth v. Taylor*, 218 A.3d 1275, 1285-86 (Pa. 2019) (Dougherty, J., Opinion in Support of Affirmance ("OISA")).[3] Previously, in *Taylor*, this Court affirmed, by way of an equally divided court, a PCRA court's dismissal of a similar judicial bias-based due process claim collaterally aimed at another former member of this Court. In the present case, we are once again called upon to consider whether a PCRA court's hesitancy to order this Court to rehear an appeal without the participation of a former Justice of this Court, was correct as a matter of law. However, it has become abundantly clear to me that we lack jurisdiction to answer this unripe question, as the PCRA court never determined whether appellant's PCRA petition was timely filed, much less did it proceed to decide whether his claim warranted relief on the merits. In the absence of such findings, there is no present case and controversy regarding the proper relief that may be afforded to a hypothetical petitioner who presents a meritorious judicial bias-based due process claim in a timely PCRA petition. Accordingly, the only option is to reverse and remand with instructions for the PCRA court to determine whether appellant's petition is timely; everything the Majority purports to do beyond that is entirely advisory and non-binding as applied to future cases.

In any event, in response to the Majority's purely academic exercise, I explain below why there is good reason for the unanimous restraint shown by those PCRA courts that have recently confronted collateral allegations of appellate-level judicial bias: a PCRA court is not authorized, under the Pennsylvania Constitution, to investigate matters of judicial misconduct; or to undo this Court's precedents by means of ordering us to

---

[3] Appellant's brief actually presents four discrete questions for our review, as the Majority details in its opinion. *See* Majority Opinion at 10-11. Preliminarily, I note my concurrence with the Majority's disposition of several of those tangential issues. Specifically, I agree with the Majority that "[o]ur [prior] remand order did not resolve whether the PCRA court is empowered to afford the requested relief[,]" *id.* at 12, and its conclusion that appellant "complied with his obligations under [Pa.R.A.P.] 1925(b)." *Id.* at 13.

rehear an appeal; or to impose judicial discipline, in the form of retroactive removal from an appellate panel, for perceived violations of the Code of Judicial Conduct. Such matters are beyond the power of inferior courts in this Commonwealth. Nevertheless, as I will demonstrate, there is a path by which petitioners can collaterally vindicate legitimate judicial bias-based due process claims in a manner that does not offend the Pennsylvania Constitution.

### a. Jurisdiction

It is well-settled that "if a PCRA petition is untimely, neither this Court nor the trial court has jurisdiction over the petition. Without jurisdiction, we simply do not have the legal authority to address the substantive claims." *Commonwealth v. Chester*, 895 A.2d 520, 522 (Pa. 2006) (quotation and citation omitted); *see Commonwealth v. Cox*, 146 A.3d 221, 227 (Pa. 2016) ("a court may not address the merits of any claim raised unless the petition was timely filed or the petitioner proves that one of the three exceptions to the timeliness requirement applies"); *Commonwealth v. Abu-Jamal*, 941 A.2d 1263, 1267-68 (Pa. 2008) ("The PCRA's timeliness requirements are jurisdictional in nature and must be strictly construed; courts may not address the merits of the issues raised in a petition if it is not timely filed."). For that reason, we have repeatedly stated that even when the parties or a PCRA court do not address the timeliness of a PCRA petition, "this Court will consider the issue *sua sponte*, as it is a threshold question implicating our subject matter jurisdiction[.]" *Commonwealth v. Whitney*, 817 A.2d 473, 478 (Pa. 2003). Moreover, "[j]urisdiction of subject matter can never attach nor be acquired by consent or waiver of the parties[.]" *McGinley v. Scott*, 164 A.2d 424, 428 (Pa. 1960). Considering these mandates, our starting point for analysis purposes necessarily must begin with an assessment of jurisdiction over this matter.

As noted, because the PCRA court initially believed appellant's due process claim fell exclusively within our original jurisdiction, it transferred the case to this Court for our consideration in the first instance. We disagreed and remanded to the PCRA court "for **disposition** of [appellant]'s PCRA petition." *Koehler*, 160 A.3d at 783 (*per curiam*) (emphasis added). Although our order cited only 42 Pa.C.S. §9545(a) and did not otherwise "specify with particularity the process that the lower court needed to follow," Appellant's Brief at 21, the PCRA court's task upon remand should have been obvious. Through our instruction to "dispos[e] of" appellant's PCRA petition, we clearly intended for the court to do what every PCRA court must: first, assess its own jurisdiction to entertain the petition by determining whether it is timely, *see* 42 Pa.C.S. §9545(b); second, if the petition is timely, proceed to decide whether the petitioner has met his burden of pleading and proving by a preponderance of the evidence that he is eligible for relief, *see* 42 Pa.C.S. § 9543(a); and third, if and only if "the court rules in favor of the petitioner, [then] it shall order appropriate relief[.]" 42 Pa.C.S. §9546(a).

The PCRA court here got it exactly backwards. Instead of sequentially considering the issues of timeliness, eligibility for relief, and then relief, the PCRA court jumped straight to the issue of relief and decided that, since it could not grant the requested relief, it need not determine either the threshold jurisdictional issue or whether there was any merit at all to appellant's claim. This was error. Nothing in the PCRA or our precedents permits a PCRA court to rule upon an issue concerning relief before first determining whether it has jurisdiction over the petition and then whether the claims raised therein are meritorious. *See, e.g.*, *Commonwealth v. Pursell*, 749 A.2d 911, 914 (Pa. 2000) (timeliness of PCRA petition "presents a threshold question concerning whether there is jurisdiction to grant relief"). Consequently, as the PCRA court failed to comply with our prior instruction to "dispos[e] of" appellant's PCRA petition — *i.e.*, determine whether it

was timely and then, if warranted, address the merits of his claims — the proper course is to reverse the PCRA court's order denying relief and remand for further consideration of those issues by that court. Indeed, this is precisely what appellant asks us to do. *See* Appellant's Brief at 26 (requesting that we "remand for the lower court to comply with this Court's prior order and adjudicate [his] petition").

Rather than simply end matters there, however, the Majority proceeds as if we have jurisdiction to consider the substantive issue concerning the appropriate relief for a petitioner who pleads and proves in a timely PCRA petition that he suffered a due process violation as a result of judicial bias. We do not. Undoubtedly, had the PCRA court determined appellant's petition was timely and meritorious but still refused to grant him his requested relief, the issue would properly be before us in this appeal. But that is not what happened, as the Majority rightfully acknowledges. *See, e.g.*, Majority Opinion at 37 ("it remains to be seen whether [appellant] is entitled to relief at all"); *id.* (recognizing the Commonwealth was never even afforded the opportunity to file an answer in response to appellant's petition, wherein it could have challenged the timeliness of his petition). Surely, since "courts may not address the merits of the issues raised in a petition if it is not timely filed[,]" *see Abu-Jamal*, 941 A.2d at 1267-68, then they are equally precluded from considering substantive legal issues regarding the appropriate relief unless and until they have first established their own jurisdiction and the petitioner's entitlement to some form of relief. Without these critical findings by the PCRA court, we are presently without jurisdiction to consider this substantive issue.[4]

---

[4] The Majority argues the PCRA court "did not run afoul of the jurisdictional requirements of the PCRA" but, rather, "avoided applying the PCRA entirely[.]" Majority Opinion at 31; *see id.* at 33 (suggesting jurisdiction is not at issue since "that is not how the PCRA court proceeded" here). This is nonsensical. A PCRA court does not possess subject matter jurisdiction to consider issues — hypothetical ones, no less — outside the parameters of the PCRA. Moreover, contrary to the Majority's belief, the issue of relief is indisputably

Beyond our lack of jurisdiction (which, of course, is alone dispositive and cannot be circumvented), issues of justiciability are also implicated by the Majority's lack of restraint. We have long recognized that "judicial intervention is appropriate only where the underlying controversy is real and concrete, rather than abstract." *City of Phila. v. Commonwealth*, 838 A.2d 566, 577 (Pa. 2003). Along these lines, we have declared that courts "should not give answers to academic questions or render advisory opinions or make decisions based on assertions as to hypothetical events that might occur in the future." *Phila. Entm't and Dev. Partners v. City of Phila.*, 937 A.2d 385, 392 (Pa. 2007). *See, e.g.*, *Pittsburgh Palisades Park, LLC v. Commonwealth*, 888 A.2d 655, 659 (Pa. 2005) (courts in this Commonwealth do not render decisions in the abstract or offer purely advisory opinions); *Dep't of Envtl. Res. v. Jubelirer*, 614 A.2d 204, 212-13 (Pa. 1992) ("This Court will not break now with its long tradition of refusing to give advisory opinions."); *Pa. Pub. Util. Comm'n. v. Allgeheny Cty.*, 203 A.2d 544, 546 (Pa. 1964) ("[W]e will not render a decision which would be solely advisory in character.").

Similar concerns arise when issues in a case are unripe or moot. *See, e.g.*, *Stuckley v. Zoning Hearing Bd. of Newtown Twp.*, 79 A.3d 510, 516 (Pa. 2013) ("Where

---

"premised upon the PCRA[,]" *id.* at 32, as demonstrated by the inclusion of Section 9546 within the Act itself. *See* 42 Pa.C.S. §9546 (relief and order). Thus, substantive issues concerning relief, like substantive issues concerning the merits of a petition, may only be considered once a PCRA court is satisfied the petition is timely, thereby establishing the court's jurisdiction. The simple fact that the PCRA court in this case erred by prematurely addressing the issue of relief before fulfilling its statutory obligations to first assess timeliness and eligibility for relief, does not somehow expand this Court's own subject matter jurisdiction or give us license to perpetuate the PCRA court's mistake. Neither trial courts nor reviewing courts are permitted to evade the strict jurisdictional mandates of the PCRA to answer unripe, hypothetical issues that may never actually come to pass. *See, e.g.*, *Pursell*, 749 A.2d at 914 (timeliness of PCRA petition "presents a threshold question concerning whether there is jurisdiction to grant relief"). This is precisely why we remanded this case the first time and it is why we must do so again now. What we may not do, however, is use the PCRA court's error as a basis for circumventing the PCRA's timebar and resolving a legal inquiry in the abstract, especially where that issue may never come to fruition in this particular case.

the issues in a case are moot, any opinion issued would be merely advisory and, therefore, inappropriate.") (citation omitted); *Town of McCandless v. McCandless Police Officers Ass'n*, 901 A.2d 991, 1002 (Pa. 2006) ("Mootness poses a question of justiciability and is related to the concepts of standing and ripeness[.]"); *In re Gross*, 382 A.2d 116, 120 (Pa. 1978) (expressing the Court's special reluctance to consider moot questions which raise constitutional issues).

Without question, the Majority's analysis of the substantive relief issue in this case amounts to nothing more than an improper advisory opinion. Again, here, the PCRA court never determined whether appellant's PCRA petition was timely filed, let alone that his claim of judicial bias is meritorious and warrants some relief. In contrast, the Majority's entire analysis necessarily presumes an unripe, hypothetical situation where a petitioner files a **timely** PCRA petition raising a **meritorious** claim that his due process rights were violated by the participation of a biased jurist in a prior appeal. *See, e.g.*, Majority Opinion at 14 n.7 ("the question is whether a PCRA court, vested with jurisdiction over a cognizable claim, has the authority to grant a well-established form of relief to remedy a constitutional deprivation that has been proven on the merits"). Quite plainly, that is not the situation presently before us. Here, any issue concerning relief is obviously unripe at this time; and, if the PCRA court upon remand ultimately determines appellant's PCRA petition was untimely filed, or that it was timely filed but meritless, then the issue of relief will never ripen — it will be moot. Thus, by going out of its way to provide an answer to an academic question "based on assertions as to hypothetical events that might occur in the future[,]" *Phila. Entm't and Dev. Partners*, 937 A.2d at 392, the Majority renders what is "clearly an advisory opinion; and such an opinion is without legal effect." *Okkerse v. Howe*, 556 A.2d 827, 833 (Pa. 1989). As such, courts in this Commonwealth are not

bound to follow the Majority's analysis in this regard, and we will have to await another case to definitively resolve the question.

### b. Cognizability of Collateral Claims of Judicial Bias

Notwithstanding the fact that the Majority's substantive analysis constitutes a non-binding advisory opinion, I offer the following responses to guide future courts in the event they may actually face the hypothetical situation discussed by the Majority. Initially, I agree with the Majority that an allegation of appellate court error is generally cognizable under the PCRA. *See* Majority Opinion at 15. However, contrary to the Majority's belief there is "nothing novel" about this conclusion, *id.*, as I observed in *Taylor*, it is in fact a matter of first impression for this Court. *Taylor*, 218 A.3d at 1286 (Dougherty, J., OISA). For that reason, and because the Majority's analysis gives short shrift to the topic, I find it helpful to restate the relevant analysis set forth in my OISA in *Taylor*:

> We have explained [42 Pa.C.S. §9542's] language "demonstrates quite clearly that the General Assembly intended that claims that **could** be brought under the PCRA **must** be brought under that Act." *Commonwealth v. Hall*, 771 A.2d 1232, 1235 (Pa. 2001) (emphasis in original). *See also Commonwealth v. Fahy*, 737 A.2d 214, 223 (Pa. 1999) ("the PCRA subsumes the writ of habeas corpus with respect to remedies offered under the PCRA"), *citing Commonwealth v. Peterkin*, 722 A.2d 638 (Pa. 1998). The precise question we must answer first, then, is whether appellant's claim can be brought under the PCRA.
>
> "In order to state a cognizable claim under the PCRA, a PCRA petitioner must plead and prove by a preponderance of the evidence that his conviction resulted from one or more of the errors or defects listed in 42 Pa.C.S. §9543(a)(2)." *Commonwealth v. Liebel*, 825 A.2d 630, 632 (Pa. 2003). Although not explicitly stated in his petition, the only error even arguably implicated by appellant's judicial bias-based due process claim is Section 9543(a)(2)(i). . . . That section permits relief where a petitioner's conviction or sentence resulted from "[a] violation of the Constitution of this Commonwealth or the Constitution or laws of the United States which, in the circumstances of the particular case, so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i).

I have little conceptual difficulty accepting that this language encompasses judicial bias-based due process claims related to a judge who presided over a trial or sentencing proceeding; it is considerably more difficult, however, to reach the same conclusion with respect to a supposed bias harbored by an appellate jurist. This is so because appellate jurists, and the appellate process generally, have no connection to "the truth-determining process" or the reliability of the "adjudication of guilt or innocence." Thus, contrary to [the Majority]'s belief, *see* [Majority Opinion at 15], a literal reading of Section 9543(a)(2)(i) in fact supports the notion that appellate court errors, even those of constitutional magnitude, are **not** cognizable under the Act.

But I also recognize this Court has repeatedly expressed concern that the unavoidable result of a literal reading of this "truth-determining process" language "is a bifurcated system of post-conviction review, in which certain claims for relief are considered under the PCRA, while other claims for relief are considered outside its framework." *Commonwealth v. Lantzy*, 736 A.2d 564, 569 (Pa. 1999). Such a system, we have remarked, would run contrary to the legislature's intent to make the PCRA the exclusive vehicle for obtaining collateral review. *See id.*; 42 Pa.C.S. §9542. For this reason, at least in the context of ineffective assistance of counsel claims, we have "taken great pains on multiple occasions to explain why we believe the General Assembly preferred a broader construction of the PCRA's scope," regardless of the "truth-determining process" language contained in Section 9543(a)(2)(ii). *Commonwealth v. Haun*, 32 A.3d 697, 705 (Pa. 2011). *See, e.g.*, *Liebel*, 825 A.2d at 635-36 (counsel's failure to file petition for allowance of appeal on direct appeal "sufficiently establishes that the truth-determining process has been undermined"); *Commonwealth ex rel. Dadario v. Goldberg*, 773 A.2d 126, 130 (Pa. 2001) (claim that counsel had been ineffective during plea-bargaining process was cognizable under Section 9543(a)(2)(ii) despite fact that ineffectiveness may not have undermined truth-determining process in traditional sense); *Commonwealth v. Chester*, 733 A.2d 1242, 1250 (Pa. 1999) ("truth-determining" and "guilt or innocence" language used in Section 9543(a)(2)(ii) does not foreclose post-conviction review of penalty phase issues in capital case); *see also Lantzy*, 736 A.2d at 569-70 (rejecting Superior Court's conclusion that for a petitioner's claim to be cognizable under Section 9543(a)(2)(ii), the claim must raise a question of whether an innocent individual has been convicted).

On the other hand, "the boundaries of cognizable claims under the PCRA can only be extended so far as is consistent with the purposes of the statute[.]" *Commonwealth v. Judge*, 916 A.2d 511, 520 (Pa. 2007). Indeed, despite our recognition of the legislature's intent to channel the widest possible category of post-conviction claims into the PCRA's framework, we have on occasion recognized that certain issues fall outside the PCRA. *See*

*Commonwealth v. West*, 938 A.2d 1034, 1044 (Pa. 2007) (substantive due process challenge to the continued validity of a judgment of sentence after a nine-year pre-incarceration delay not cognizable under the PCRA); *Judge*, 916 A.2d at 520 (allegation that Canada violated appellant's rights under the International Covenant for Civil and Political Rights by deporting him to face a death sentence not cognizable under the PCRA because claim has "no connection to the truth-determining process and do[es] not render the underlying adjudication of guilt or innocence . . . unreliable"). In these unique situations, we found the claims "did not implicate any of the remedies available pursuant to the PCRA and, accordingly, we held that *habeas* review was warranted." *West*, 938 A.2d at 1043. *See* PA. CONST. art. I, §14 ("[T]he privilege of the writ of habeas corpus shall not be suspended[.]"); 42 Pa.C.S. §6501 (same).

What we must decide here is whether an alleged constitutional error occurring during the appellate process — one that does not relate to counsel's performance — can be channeled into those broad categories of claims that are cognizable under the PCRA, or whether such a claim is too far removed from the truth-determining process to fall within the ambit of the PCRA. On balance, and especially without more pointed advocacy to the contrary, I am satisfied for purposes of this appeal that appellant's claim of appellate court error is (at least theoretically) cognizable under the PCRA. This conclusion hews most closely to this Court's jurisprudence regarding the cognizability of a broader scope of claims under the PCRA, regardless of the statute's facially-limiting "truth-determining process" language.[2]

_____

[2.] On this point, I observe this Court has on two occasions recognized, albeit implicitly, that its broad construction of the "truth-determining process" language in Section 9543(a)(2)(ii) applies with equal force to the identical language found in Section 9543(a)(2)(i). *See Commonwealth v. Hackett*, 956 A.2d 978, 985 (Pa. 2008) (rejecting argument that a *Batson* claim is "unrelated to the reliability of the verdict rendered" and so does not implicate a cognizable constitutional violation under Section 9543(a)(2)(i)); *Commonwealth v. Cruz*, 851 A.2d 870, 875, 878 (Pa. 2004) (holding relief was "available on collateral review in the particularized circumstances presented" even though the petitioner's claim he was denied due process and equal protection on direct appeal, on the basis of disparate treatment from his co-defendant, "asserts a breakdown in the appellate process, not trial").

*Taylor*, 218 A.3d at 1287-89 (Dougherty, J., OISA) (emphasis in original).

In short, I agree with the Majority that appellate court errors of constitutional magnitude are cognizable under Section 9543(a) of the PCRA — subject, of course, to the ordinary eligibility constraints imposed by the Act.

### c. Judicial Bias Claims Arising Under the Due Process Clause

Before addressing my primary source of disagreement with the Majority's analysis — *i.e.*, the proper **relief** available for those exceptional cases where a petitioner successfully proves in a timely PCRA petition that a constitutional violation occurred during the appellate process — I find it crucial to define more precisely those judicial bias claims implicating due process, since any judicial bias claim that falls short of a constitutional violation would not provide a basis for post-conviction relief under Section 9543(a)(2)(i).

Nearly one hundred years ago, the Supreme Court of the United States declared that not all questions of judicial qualification "involve constitutional validity." *Tumey v. State of Ohio*, 273 U.S. 510, 523 (1927). Rather, because the federal "Due Process Clause demarks only the outer boundaries of judicial disqualifications[,]" *Aetna Life Ins. Co. v. Lavoie*, 475 U.S. 813, 828 (1986), "most matters relating to judicial disqualification [will] not rise to a constitutional level." *FTC v. Cement Institute*, 333 U.S. 683, 702 (1948) (citation omitted). "Thus matters of kinship, **personal bias**, state policy, remoteness of interest would seem generally to be matters merely of legislative discretion." *Tumey*, 273 U.S. at 523 (emphasis added). This is so because "the traditional common-law rule was that disqualification for bias or prejudice was not permitted." *Lavoie*, 475 U.S. at 820 (citations omitted); *see also Caperton v. A.T. Massey Coal Co., Inc.*, 556 U.S. 868, 877 (2009) ("Personal bias or prejudice alone would not be sufficient basis for imposing a constitutional requirement under the Due Process Clause.") (internal quotation marks and citation omitted). Instead, "the Due Process Clause incorporated the common-law rule that a judge must recuse himself when he has 'a direct, personal, substantial, pecuniary interest' in a case." *Caperton*, 556 U.S. at 876, *quoting Tumey*, 273 U.S. at 523; *see also* Frank, *Disqualification of Judges*, 56 YALE L.J. 605, 609 (1947) ("The common law of

disqualification . . . was clear and simple:  a judge was disqualified for direct and pecuniary interest and for nothing else.").

Over time, however, new problems emerged that were not determined at common law, prompting the Supreme Court to identify "additional instances which, as an objective matter, require recusal." *Caperton*, 556 U.S. at 877.  The first instance involved situations where "a judge had a financial interest in the outcome of a case, although the interest was less than what would have been considered personal or direct at common law." *Id. See, e.g.*, *Tumey*, 273 U.S. at 535 (where town mayor presided over certain bench trials in "mayor's court" and received salary supplement that was derived directly from court costs assessed upon conviction, due process required mayor's recusal); *Ward v. Village of Monroeville, Ohio*, 409 U.S. 57, 60 (1972) (where town mayor presided over municipal traffic cases and resulting fines upon conviction constituted major revenue stream for town, due process required mayor's recusal); *Lavoie*, 475 U.S. at 823-24 (in case involving bad faith refusal to pay insurance claim, where state supreme court justice cast deciding vote to uphold punitive damage award against defendant insurance company, while at the same time serving as lead plaintiff in nearly identical lawsuit pending against different insurance company, due process required justice's recusal).

The second instance involved cases where judges had no pecuniary interest in the case, but had a conflict arising from participation in an earlier proceeding — a so-called "one-man grand jury" situation. *Caperton*, 556 U.S. at 880.  *See, e.g.*, *In re Murchison*, 349 U.S. 133, 136 (1955) (where judge sitting as a one-person secret grand jury charged two witnesses with contempt, due process required judge's recusal from the witnesses' subsequent bench trial on those charges; "no man can be a judge in his own case and no man is permitted to try cases where he has an interest in the outcome"); *Mayberry v. Pennsylvania*, 400 U.S. 455, 465-66 (1971) (although "not every attack on a judge . . .

disqualifies him from sitting[,]" where judge hearing criminal matter was repeatedly insulted and demeaned by *pro se* defendant during course of trial, due process required judge to recuse himself from defendant's subsequent contempt proceedings, because defendant's personal attacks against judge made it unlikely that judge could maintain the "calm detachment necessary for fair adjudication"). Importantly, in each of these cases the Supreme Court "was careful to distinguish the extreme facts of the cases before it from those interests that would not rise to a constitutional level." *Caperton*, 556 U.S. at 887 (citations omitted).

Aside from the two defined situations above, the Supreme Court had otherwise declined to require judicial recusal under the Due Process Clause. Then, however, the Court decided *Caperton*, in which it considered how its due process precedents applied to the unique circumstances where the Supreme Court of Appeals of West Virginia, in a 3 to 2 vote, reversed a $50 million jury verdict entered against a defendant coal company and its affiliates. Before the case reached the Supreme Court of Appeals, the CEO of the coal company contributed or made expenditures totaling approximately $3 million to help the electoral campaign of an attorney running to unseat one of the court's then-incumbent justices. The attorney won his election, declined to recuse from the case, and ultimately provided the dispositive vote as a member of the Supreme Court of Appeals in favor of the coal company.

The High Court reversed, and in the process, adopted a new standard requiring recusal "when the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Id.* at 872 (internal quotation marks and citation omitted). The Court framed the inquiry as "whether, under a realistic appraisal of psychological tendencies and human weakness, the interest poses such a risk of actual bias or prejudgment that the practice must be forbidden if the guarantee of due process

is to be adequately implemented." *Id.* at 883-84 (internal quotation marks and citation omitted). Moreover, the Court explained the "inquiry is an objective one. The Court asks not whether the judge is actually, subjectively biased, but whether the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Id.* at 881. Applying these principles to the "extreme facts" in *Caperton*, the Court concluded there is a serious risk of actual bias "when a person with a personal stake in a particular case had a significant and disproportionate influence in placing the judge on the case by raising funds or directing the judge's election campaign when the case was pending or imminent." *Id.* at 884. However, the Court reiterated that it is "an extraordinary situation where the Constitution requires recusal[,]" *id.* at 887, and reasoned that because state "codes of judicial conduct provide more protection than due process requires, most disputes over disqualification will be resolved without resort to the Constitution." *Id.* at 890; *see id.* ("Application of the constitutional standard implicated in this case will . . . be confined to rare instances.").

Most recently, the Supreme Court applied the standard it adopted in *Caperton* to the facts in *Williams v. Pennsylvania*, 136 S.Ct. 1899 (2016). There, the Court considered how its due process precedents applied to a situation where a judge — former Chief Justice Ronald D. Castille of this Court — had prior involvement in a case as a prosecutor. The Court explained "the principles on which [its] precedents rest dictate the rule that must control[,]" and held that "under the Due Process Clause there is an impermissible risk of actual bias when a judge earlier had significant, personal involvement as a prosecutor in a critical decision regarding the defendant's case." *Id.* at 1905. The Court also proceeded to consider whether a due process violation arising from a jurist's failure to recuse amounts to harmless error if the jurist is on a multimember court and the jurist's vote was not decisive, and answered that question in the negative. *See id.* at 1909 ("a

due process violation arising from the participation of an interested judge is a defect not amenable to harmless-error review, regardless of whether the judge's vote was dispositive") (internal quotation and citation omitted); *see also id.* ("an unconstitutional failure to recuse constitutes structural error even if the judge in question did not cast a deciding vote").

Collectively, the Supreme Court's jurisprudence dictates the proper standards that govern appellant's claim, and can be summarized as follows. Recusal is required under the Federal Due Process Clause — and, by extension, the State Due Process Clause[5] — only when "the probability of actual bias on the part of the judge or decisionmaker is too high to be constitutionally tolerable." *Caperton*, 556 U.S. at 872.[6] A court considering a judicial bias claim must ask "not whether a judge harbors an actual, subjective bias, but instead whether, as an objective matter, 'the average judge in his position is 'likely' to be neutral, or whether there is an unconstitutional 'potential for bias.'" *Williams*, 136 S.Ct. at 1905, *quoting Caperton*, 556 U.S. at 881.[7] When such a claim is raised collaterally in a

---

[5] *See, e.g., Commonwealth v. Wallace*, 97 A.3d 310, 320 (Pa. 2014) ("This Court has found that the guarantees associated with the due process clause of the federal constitution are generally coextensive with those under the Pennsylvania Constitution.") (internal quotation marks and citation omitted).

[6] At times throughout its opinion, the Majority implies due process is violated where there is only the **appearance of bias**. *See, e.g.*, Majority Opinion at 26 (noting the "importance of protecting against even the appearance of partiality"); *see also* Concurring Opinion at 3 ("Justice must satisfy the appearance of justice[.]") (citation omitted). Appellant forwarded similar iterations of this standard before the PCRA court, *see, e.g.*, PCRA Petition, 12/7/2015, at 18 ("Justice Eakin's participation . . . violated Due Process on the basis of the appearance of bias"), and does the same in his appellate brief, *see, e.g.,* Appellant's Brief at 20 (arguing his claims are "aimed at bias, the risk of bias, or the appearance of bias that affected his appeal"). This "appearance of bias" standard is indisputably less strict than the one imposed by the Due Process Clause, and to the extent the Majority is subtly attempting to broaden the proper constitutional standard, it is improper.

[7] The Majority asserts that "claims of judicial bias [ ] require precisely the kind of factual development best suited to the courts of common pleas[,]" potentially including "an

timely PCRA petition, the onus is on the petitioner to plead and prove by a preponderance of the evidence that (1) his due process rights have been violated by the jurist's failure to recuse — *i.e.*, that, viewed objectively, the probability of actual bias on the part of the judge is too high to be constitutionally tolerable — and (2) the violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i).[8] Relief may be granted only where a petitioner meets this burden and satisfies the PCRA's other eligibility requirements.

### d. Available Relief for a Proven Due Process Violation

---

evidentiary hearing to resolve disputed facts." Majority Opinion at 27. This would seem to imply that a petitioner asserting a collateral claim of judicial bias is entitled to call as a witness the jurist in question to root out any bias. I strongly disagree with this implication. For one thing, evaluation of a due process claim based on judicial bias requires only an objective inquiry; the task is **not** to "determine whether there was actual bias." *Caperton*, 556 U.S. at 882. Moreover, the power to investigate or police alleged judicial misconduct or bias — by, for example, permitting a jurist to be called as a witness, or authorizing discovery against the jurist — is surely beyond the authority of a PCRA court. *See generally In re Melograne*, 812 A.2d 1164, 1167 (Pa. 2002) ("It is beyond cavil that the Court of Judicial Discipline has jurisdiction over the general subject matter presented here, namely, determining whether an individual engaged in judicial misconduct. In fact, that is the tribunal's constitutional *raison d'etre*."); *In re Avellino*, 690 A.2d 1138, 1143 (Pa. 1997) ("The 1993 amendments to [Pa. Const. art. V, §18] altered the mechanism for investigating and adjudicating charges of judicial misconduct by . . . creating the Judicial Conduct Board and the Court of Judicial Discipline.").

[8] It is an open question whether a petitioner is entitled to automatic relief if he successfully pleads and proves by a preponderance of the evidence that a judicial bias-based due process violation occurred, or whether he must also prove the violation "so undermined the truth-determining process that no reliable adjudication of guilt or innocence could have taken place." 42 Pa.C.S. §9543(a)(2)(i). *Cf.* Appellant's Brief at 26 ("the constitutional violations at issue in the instant petition are not amenable to [a prejudice] analysis" since they "constitute structural error"). Although it is true the Supreme Court in *Williams* held that "an unconstitutional failure to recuse constitutes structural error[,]" 136 S.Ct. at 1909, the Court has elsewhere recognized that "the term 'structural error' carries with it no talismanic significance as a doctrinal matter[,]" and some structural errors, when raised collaterally (as here), as opposed to on direct review (as in *Williams*), still require a showing of prejudice. *Weaver v. Massachusetts*, 137 S.Ct. 1899, 1910 (2017). In any event, resolution of this issue is not necessary for present purposes.

Having established that a judicial bias-based due process claim is cognizable under the PCRA, and having defined the appropriate framework for assessing the merits of such a claim, the question that remains is: what relief may lawfully be afforded to remedy a due process violation occasioned by the participation of a biased jurist in a prior appellate proceeding? Answering this complex question requires due consideration of a multitude of factors, including the authority vested in this Court by the Pennsylvania Constitution and the judicial hierarchical system established therein; principles of *stare decisis*, binding precedent, and the law of the case; and enforcement of the Code of Judicial Conduct.

Turning first to the power of this Court, the proper place to begin is the Pennsylvania Constitution itself, which "is explicit regarding the breadth of the Court's authority over the Unified Judicial System." *In re Bruno*, 101 A.3d 635, 663 (Pa. 2014). In this respect, I have previously observed:

> All Pennsylvania courts derive their judicial power or authority from the Constitution and the laws of the Commonwealth. PA. CONST. art. V, §1 ("The judicial power of the Commonwealth shall be vested in a unified judicial system[.]"). "At the apex of the Unified Judicial System is the Pennsylvania Supreme Court." *In re Bruno*, 101 A.3d [at] 663[,] *citing* PA. CONST. art. V, §2(a) (Supreme Court is "highest court of the Commonwealth and in this court shall be reposed the supreme judicial power of the Commonwealth"). *See* 42 Pa.C.S. §501 (codifying PA. CONST. art. V, §2(a)). In addition to its supreme judicial power, this Court has "general supervisory and administrative authority over all the courts and [magisterial district judges.]" PA. CONST. art. V, §10(a). "This power implicates a dual authority: (1) over personnel of the system, among them jurists; and (2) over inferior tribunals[.]" *Bruno*, 101 A.3d at 678.[3]

_____
[3] The General Assembly has also recognized this Court has "[a]ll powers necessary or appropriate in aid of its original and appellate jurisdiction which are agreeable to the usages and principles of law" and any power vested in it by statute. 42 Pa.C.S. §502. As well, the Court has "the power generally to minister justice to all persons and to exercise the powers of the court, as fully and amply, to all intents and purposes, as the justices of the Court of King's Bench, Common Pleas and Exchequer, at Westminster, or any of them, could or might do on May 2, 1722." *Id.*

*Taylor*, 218 A.3d at 1289-90 (Dougherty, J., OISA).  Relatedly, "[i]n furtherance of our exclusive right to supervise the conduct of all courts and officers of the judicial branch of government pursuant to . . . our Constitution, we have adopted rules of judicial conduct for ourselves and all members of the judicial branch."  *Reilly by Reilly v. SEPTA*, 489 A.2d 1291, 1298 (Pa. 1985).

Our "supervisory power over the Unified Judicial System is beyond question."  *In re Bruno*, 101 A.3d 635 at 678.  In fact, we have gone so far as to say that, "[b]y its 'supreme' nature, the inherent adjudicatory, supervisory, and administrative authority of this Court . . . is very high and transcendent[.]"  *In re Bruno*, 101 A.3d 635 at 669 (internal quotation marks and citation omitted).  And we have long warned "against any judicial inclination to narrow that authority, lest the members of the Court abandon their duty to exercise the power they hold in trust for the people."  *Id.* at 679; *see also id.* at 668 ("as it is a trust for the people of Pennsylvania, judges have no right, from motives of ease and convenience, to surrender, weaken, or obscure, by judicial refinements, one single one of the powers granted"); *id.* at 660 ("our charter is a fundamental document" which "provides essential checks and balances whose complexity is to be neither undervalued nor disregarded").  To that end, we have consistently and firmly rejected invitations to interpret our powers narrowly — particularly our supervisory authority over inferior courts and judicial personnel.  Two examples prove the point.

In *Reilly*, the defense in a personal injury action alleged for the first time on appeal that the trial court had a prior relationship with plaintiff's counsel, in violation of the Code of Judicial Conduct.  On appeal, the Superior Court agreed and *sua sponte* directed that a different judge take over the case on remand; the court also purported to establish a rule that in any recusal motion, a different judge would be required to rule on the motion, because the judge being asked to recuse could not objectively address the issue of his

impartiality. We granted allowance of appeal to consider "an apparent usurpation by an intermediate appellate court of administrative power reserved exclusively to us by the Constitution of our Commonwealth[,]" and subsequently reversed. 489 A.2d at 1296. We held: "Perceived violations of [the Code of Judicial Conduct] do not permit the trial courts or the intermediate appellate courts to alter the rules of law, evidentiary rules, presumptions or burdens of proof." *Id*. at 1299. "More importantly," we concluded, "violations of [the Code] are not a proper subject for consideration of the lower courts to impose punishment for . . . judicial misconduct." *Id*. In this regard, we noted "we have not abdicated or delegated any of our supervisory authority in enforcing these standards of conduct to Superior Court[,]" and thus that court's consideration of such matters was "an impermissible meddling into the administrative and supervisory functions of this Court over the entire judiciary." *Id*.

The result in *Commonwealth v. Whitmore*, 912 A.2d 827 (Pa. 2006), was similar. There, upon review of a discretionary sentencing claim, the Superior Court concluded that because there was nothing in the record indicating the defendant received an individualized sentence, "'the integrity of the re-sentencing proceeding must be protected by ensuring that any appearance of bias is dispelled.'" *Id*. at 832. Accordingly, the court ordered a new trial judge be assigned to preside over the re-sentencing hearing. We granted discretionary review to consider "whether the Superior Court has the power to order the removal of a judge from a case, where that judge has made no ruling concerning recusal because he or she was never asked." *Id*. Once more, we reversed, concluding that such a question "falls within the scope of supervisory and administrative powers over all of the courts." *Id*.; *see also id*. at 834 ("the *sua sponte* removal of the trial judge on remand for sentencing exceeded the authority of the Superior Court").

Before considering how the principles undergirding *Reilly* and *Whitmore* apply to the present matter, it is beneficial to first examine the other relevant concepts at play. As noted at the outset, any relief that we may sanction to remedy a judicial bias-based due process violation must also take into account the principles of *stare decisis*, binding precedent, and the law of the case. Again, these are concepts developed in my OISA in *Taylor*:

Considering the clear judicial hierarchy enshrined in these various constitutional and statutory provisions, it is beyond peradventure that "[i]f a majority of the Justices of this Court, after reviewing an appeal before us (taken either by way of direct appeal or grant of allowance of appeal), join in issuing an opinion, our opinion becomes binding precedent on the courts of this Commonwealth." *Commonwealth v. Tilghman*, 673 A.2d 898, 903 (Pa. 1996) (citation omitted). *See, e.g.*, *Walnut St. Assocs., Inc. v. Brokerage Concepts, Inc.*, 20 A.3d 468, 480 (Pa. 2011) ("intermediate appellate courts are duty-bound to effectuate this Court's decisional law") (citation omitted); *Commonwealth v. Provident Trust Co. of Philadelphia*, 180 A. 16, 17 (Pa. 1935) (same with respect to trial courts). "Our majority opinion is binding not only on the parties before us, under the doctrine of law of the case, but is precedent as to different parties in cases involving substantially similar facts, pursuant to the rule of *stare decisis*." *Tilghman*, 673 A.2d at 903 (footnotes omitted). Unless the United States Supreme Court reverses a decision of this Court, or this Court overrules its own prior decision, "the law emanating from the decision remains law." *Fiore v. White*, 757 A.2d 842, 847 (Pa. 2000).

The need for scrupulous adherence to this hierarchical system is manifest: it "lends uniformity and certainty to the law but allows sufficient flexibility for change by the highest court, but only the highest court, in our judicial system." *Lovrinoff v. Pennsylvania Tpk. Comm'n*, 281 A.2d 176, 178 (Pa. Cmwlth. 1971). *See also Malinder v. Jenkins Elevator & Mach. Co.*, 538 A.2d 509, 513 (Pa. Super. 1988) (inferior courts have an obligation to follow and apply Supreme Court decisions "so as to establish some measure of predictability and stability in our case law"). In that vein, we have cautiously guarded our role as the highest court in the Commonwealth and exhibited no tolerance for inferior courts that attempt to ignore or overturn our binding precedent. *See, e.g.*, *Commonwealth v. Buehl*, 658 A.2d 771, 782 (Pa. 1995) (PCRA court's vacation of death sentence, based on its conclusion this Court erred when it failed to vacate sentence on direct appeal, was improper; there is no authority "which permits the Courts of Common Pleas of this Commonwealth to overrule the decisions of this Court").

*Taylor*, 218 A.3d at 1290 (Dougherty, J., OISA).

Taking this constellation of principles into consideration, I conclude, as I did in *Taylor*, that the Majority's "position that PCRA courts should be afforded the power to order appellate courts to rehear *nunc pro tunc* appeals based on supposed appellate court error would run afoul of these constitutionally-grounded principles." *Id.* In my view, although a PCRA court possesses jurisdiction to consider a timely and properly raised judicial bias-based due process claim and to rule upon the legal merits thereof, as an inferior court, it is constitutionally precluded from affording relief in the form of a *nunc pro tunc* appeal. There are a number of reasons why this is the case.

First, as I articulated in *Taylor*, "the grant of an appeal *nunc pro tunc* premised on judicial bias would operate to undo the prior 'tainted' decision" — indeed, for all practical purposes, the grant of a *nunc pro tunc* appeal would "wipe [the prior decision] from the record books." *Id.* at 1291. The Majority curtly asserts otherwise, arguing the decision in *Koehler II* "would be vacated, overturned, or modified only if this Court, in Koehler's new appeal, decided to vacate, overturn, or modify *Koehler II*." Majority Opinion at 29. This ignores reality and misses the point. Whether a new appellate panel ultimately reaches the same disposition as the original appellate panel is irrelevant; what matters is that, once a *nunc pro tunc* appeal has been granted, the prior opinion, as written by the original panel of jurists, ceases to exist as binding authority.[9] *See generally Jackson ex rel. Sanders v. Hendrick*, 746 A.2d 574, 579 (Pa. 2000) (Zappala, J., concurring) (decision to grant reconsideration "has the effect of vacating the original order; until the court enters

---

[9] Notably, "[t]his distinguishes the instant situation from those in which we have approved the grant of an appeal *nunc pro tunc* to remedy the deprivation of the right to appeal based on ineffective assistance of counsel. *See, e.g.*, *Liebel*, *supra*; *Lantzy*, *supra*. In those cases, the grant of a new appeal did not nullify or cast doubt upon the propriety of the prior judicial decision in any way. The same cannot be said here." *Taylor*, 218 A.3d at 1291 n.5 (Dougherty, J., OISA).

its decision on reconsideration, the status of the case is as if no order had been entered"); *Barron v. City of Philadelphia*, 754 A.2d 738, 740 (Pa. Cmwlth. 2000) ("when a court enters an order expressly granting reconsideration, it would follow that the order under reconsideration is effectively vacated"); DARLINGTON, MCKEON, SCHUCKERS & BROWN, 20A WEST'S PA. PRAC., APPELLATE PRACTICE §2546:3 (where reargument of appellate decision is granted, the order granting reargument "effectively vacates [the] prior order"). But this is precisely what cannot be permitted, because the opinion in *Koehler II*, as it exists in its current form today, **is** binding precedent, and no inferior court may constitutionally alter that reality via a *nunc pro tunc* order or any other means. *See, e.g.*, *In re Bruno*, 101 A.3d at 655, 688 (agreeing that because Supreme Court is the highest court of the Commonwealth, vested with "supreme" judicial power, its orders are "preeminent" and may not be modified, altered, amended, set aside, or disturbed by an inferior court); *see generally United States v. Gillespie*, 666 F.Supp. 1137, 1139 (N.D. Ill. 1987) ("*Nunc pro tunc* orders are not some Orwellian vehicle for revisionist history — creating 'facts' that never occurred in fact."). "[O]nly this Court or the United States Supreme Court has the power to undo our prior decisions[,]" or to even agree to reconsider our prior decisions. *Taylor*, 218 A.3d at 1291 (Dougherty, J., OISA).[10]

---

[10] The fallacy of the Majority's contrary argument is easy to illustrate. Much like this Court is at the apex of the Unified Judicial System, the Supreme Court of the United States sits atop the federal judiciary. The High Court, like this Court, has made crystal clear that inferior tribunals are powerless to disturb its precedents. *See, e.g.*, *Thurston Motor Lines, Inc. v. Jordan K. Rand, Ltd.*, 460 U.S. 533, 535 (1983) ("Needless to say, only this Court may overrule one of its precedents."); *Hutto v. Davis*, 454 U.S. 370, 375 (1982) ("[U]nless we wish anarchy to prevail within the federal judicial system, a precedent of this Court must be followed by the lower federal courts no matter how misguided the judges of those courts may think it to be."). However, under the Majority's view, it would be entirely proper for a federal district court to determine a former United States Supreme Court Justice harbored a disqualifying bias in a given case and, as a result, grant a *nunc pro tunc* appeal and force the Supreme Court to reconsider the case without the interested justice's

The constructs of *stare decisis*, binding authority, and law of the case, which derive at least in part from the judicial hierarchy established by the Pennsylvania Constitution, provide ample bases for rejecting the Majority's position outright. But there is another reason, also grounded in constitutional principles, that compels the same result: the retroactive removal of a jurist from an appellate panel constitutes an impermissible

---

participation. Obviously, the High Court would never entertain such absurdity; yet, bizarrely, that is precisely what the Majority expects of this Court.

Moreover, I imagine the High Court would find little comfort — and rightfully so — in the Majority's explanation that the Court's previously binding authority will not be officially "vacated, overturned, or modified" unless the High Court itself affirms the federal court's grant of relief and later distances itself from the original opinion in the new appeal. Majority Opinion at 29. *Cf. Hohn v. United States*, 524 U.S. 236, 252-53 (1998) ("Our decisions remain binding precedent until **we** see fit to reconsider them[.]") (emphasis added). Equally discomforting is the Majority's insistence that we should be unconcerned with the practical effect of inferior courts unilaterally scrubbing our binding decisions since the Commonwealth would remain "entitled to appeal the order [granting a *nunc pro tunc* appeal] to the appellate courts, which have the appellate authority to reverse the award of relief[.]" *Id.* at 29. As I expressed in *Taylor*, "this assumes the Commonwealth appeals the grant of relief, which recent experience has taught us is not a certainty. Indeed, under the [Majority's] reasoning, this Court would be powerless to review the grants of relief in [a number of similar Philadelphia cases], since there are no pending Commonwealth appeals in those cases. . . . [T]he Court should not willingly allow its hands to be tied in this manner, particularly when our Constitution dictates otherwise." *Taylor*, 218 A.3d at 1292 n.7 (Dougherty, J., OISA) (internal brackets and quotations omitted).

Finally, just as the OISR in *Taylor* did, the Majority here blatantly misrepresents what occurred in *Williams* to support its false narrative that the grant of a *nunc pro tunc* appeal to remedy appellate-level judicial bias claims is a widely sanctioned remedy. *See* Majority Opinion at 21 ("The due process right to an impartial trial was vindicated in *Williams* with the award of a new, *de novo* appeal."). In point of fact, the procedural posture of *Williams* — wherein the Supreme Court of the United States granted **direct review** of former Chief Justice Castille's refusal to recuse — "demonstrates only that a higher tribunal is empowered to vacate a lower court's decision when it determines the lower court committed a constitutional violation — the precise proposition I forward here." *Taylor*, 218 A.3d at 1292 n.8 (Dougherty, J., OISA). Thus, to the extent it even speaks to the discrete issue of the appropriate remedy in the post-conviction context, and whether lower courts can constitutionally order higher tribunals to rehear an appeal, *Williams* does not support the Majority's position; it directly undermines it.

meddling into the administrative and supervisory authority this Court wields over the entire judiciary.

It is settled law that "violations of [the Code of Judicial Conduct] are not a proper subject for consideration of the lower courts to impose punishment for . . . judicial misconduct." *Reilly*, 489 A.2d at 1299. The Majority does not dispute this point, but claims the PCRA court "fundamental[ly] misunderst[ood]" the relief appellant sought, since appellant "did not ask the PCRA court to impose discipline against Justice Eakin or to enforce the Code of Judicial Conduct as if it were a disciplinary board." Majority Opinion at 24; *see also id.* at 23 ("This Court's supervisory authority over the conduct of judges pursuant to Article V, [§]10(c) of our Constitution is unchallenged and is not implicated in this case."). In actuality, it is the Majority, not the PCRA court, that fundamentally misunderstands the import of the relief appellant seeks.

As the PCRA court wisely explained in its opinion, while "[i]t is true that [a]ppellant does not ask this court to impose discipline for improper judicial conduct," the fact remains that a determination "that a superior judicial officer violated specific canons within the Code of Judicial Conduct is a *sine qua non*" of a due process claim based on alleged judicial bias. PCRA Ct. Op., 11/6/2018 at 4 n.6. Stated differently, a judicial finding that due process has been violated by a jurist's failure to recuse necessarily entails a finding that one or more of the canons of judicial conduct has also been violated. *See, e.g.*, *Caperton*, 556 U.S. at 890 ("codes of judicial conduct provide **more** protection than due process requires") (emphasis added). We have cautioned, however, that the enforcement of such rules is beyond the jurisdiction of inferior courts and amounts to an "unwarranted intrusion[ ] upon this Court's exclusive right to supervise the conduct of all courts and officers of the judicial branch." *Reilly*, 489 A.2d at 1298. The relevant

question, then, is whether the grant of a *nunc pro tunc* appeal premised on a finding of judicial bias, violates these principles. It unquestionably does.

The grant of a *nunc pro tunc* appeal not only undoes the prior decision, as previously discussed, but it also "clear[s] a path for the appellate tribunal to issue a new decision without the interested jurist's participation." *Taylor*, 218 A.3d at 1291 (Dougherty, J., OISA). Therefore, the practical effect of a PCRA court's grant of a *nunc pro tunc* appeal based on judicial bias is that it retroactively removes a jurist from the case, and precludes the jurist from participation in the new appeal. This action simply cannot be characterized as anything other than imposition of punishment for a perceived violation of the Code of Judicial Conduct. *See Reilly*, 489 A.2d at 1299.

Our decisions in *Reilly* and *Whitmore* directly support this conclusion. In those cases, we unambiguously declared the Superior Court had exceeded the bounds of its authority when it directed the removal of a trial judge. *See id.* ("we have not abdicated or delegated any of our supervisory authority in enforcing these standards of conduct to Superior Court"); *Whitmore,* 912 A.2d at 832 (removal of a judge "falls within the scope of supervisory and administrative powers over all of the courts"). It necessarily follows that since the Superior Court lacks constitutional authority to remove a trial judge from a case — even though the intermediate appellate court is the superior tribunal — then a trial court's retroactive removal of a Justice of the highest court in this Commonwealth from a case, raises even greater constitutional concerns. Thus, for this independent reason as well, a PCRA court's grant of a *nunc pro tunc* appeal to remedy a judicial bias-based due process violation plainly violates the Pennsylvania Constitution.[11]

---

[11] The Majority suggests that, if a PCRA court is precluded from granting a *nunc pro tunc* appeal based on a finding of judicial misconduct, then it must be equally true that a PCRA court cannot order the *nunc pro tunc* reinstatement of appellate rights based on a finding of ineffective assistance of counsel, since both involve the consideration of standards of conduct. *See* Majority Opinion at 22-23. This is incorrect. The dispositive concern is not

Fortunately, however, a petitioner who can substantiate a judicial bias-based due process claim is not without recourse. As I explained in *Taylor*,

> there is in my view a constitutionally-permissible remedy for the exceptional case where a petitioner successfully pleads and proves in a timely PCRA petition that a constitutional violation occurred during the appellate process: a PCRA court can lawfully reinstate the petitioner's *nunc pro tunc* right to seek reargument of the original appellate decision pursuant to Pa.R.A.P. 2543. Although reargument is not a matter of right, but of sound judicial discretion, an appellate court may grant it "when there are compelling reasons therefor." Pa.R.A.P. 2543. From my perspective, a legitimate claim of constitutional error committed during the appellate process which is supported by credible evidence would ordinarily present a compelling reason warranting reargument. And crucially, an order reinstating a petitioner's right to seek reargument would not offend the judicial hierarchy set forth in the Pennsylvania Constitution, as it would merely present the appellate tribunal with the **opportunity** to reconsider its prior decision. In the same way that the *nunc pro tunc* reinstatement of the right to file a petition for allowance of appeal in this Court does not encroach on this Court's powers, neither would the *nunc pro tunc* reinstatement of the right to seek reargument. This remedy is, in my considered opinion, the only lawful one available to PCRA courts faced with a viable claim of appellate court error.

*Taylor*, 218 A.3d at 1292 (Dougherty, J., OISA) (emphasis in original).

---

an inferior court's **consideration** of a jurist's or attorney's conduct when deciding upon an issue of constitutional error; it is the inferior court's imposition of **punishment** for said conduct that is prohibited. *See Reilly*, 489 A.2d at 1298 ("The rules do not give standing to [inferior courts] to seek compliance or enforcement of the Code[.]"). When a jurist is retroactively removed from a case and a new appellate panel is required to decide the case anew absent the allegedly biased jurist's participation, the inferior court has undoubtedly sanctioned the jurist, even if that was not the primary purpose of the action taken. In stark contrast, when a defendant secures *nunc pro tunc* appellate rights as a result of prior counsel's ineffectiveness, the prior attorney has suffered no tangible harm or sanction whatsoever. Tellingly, the Majority does not even attempt to refute this point or to reconcile its position with our unambiguous holdings in *Reilly* and *Whitmore*, except to say in passing that PCRA courts are entitled to remedy constitutional violations "[r]egardless of the collateral consequences" that doing so may have. Majority Opinion at 25. However, *Reilly* and *Whitmore* instruct — in fact, they demand, as a matter of Pennsylvania constitutional law — that this Court must concern itself with collateral consequences that infringe on our exclusive supervisory and administrative powers over the courts and their personnel.

The Majority dismisses the notion that *nunc pro tunc* reinstatement of the right to seek reargument of a supposedly tainted appellate decision is a viable remedy for a due process violation premised on judicial bias. It summarily argues, "exercising the rule-based right to seek reargument from the allegedly tainted court would be insufficient to remedy the potential bias in the initial decision and to preserve the appearance and reality of impartial justice." Majority Opinion at 26-27. Yet, the Majority fails to explain why this remedy would be in any way "insufficient."

To the extent the Majority believes this Court would not be able to fairly consider a motion for reargument because it is "the same appellate court that [the] litigant is accusing of bias and partiality[,]" *id.*, this sentiment ignores that there is a "presumption of honesty and integrity in those serving as adjudicators[.]" *Withrow v. Larkin*, 421 U.S. 35, 47 (1975); *see also Republican Party of Minn. v. White*, 536 U.S. 765, 796 (2002) (Kennedy, J., concurring) ("We should not, even by inadvertence, 'impute to judges a lack of firmness, wisdom, or honor.'") (citation omitted); *Goodheart v. Casey*, 565 A.2d 757, 763 (Pa. 1989) ("[U]nder our tradition it has been a cardinal rule that 'the law will not suppose a possibility of bias or favor in a judge, who is already sworn to administer impartial justice, and whose authority greatly depends upon that presumption and idea.'") (citation omitted). The Majority also neglects the fact that a litigant would be free to seek the recusal of the allegedly biased appellate jurist from consideration of the litigant's motion for reargument — assuming, of course, that the jurist is still a member of the appellate body (which is not the case here) and has not preemptively recused with respect to the reargument motion. As well, the Majority disregards entirely the availability of further review of this Court's decision on the motion for reargument before the ultimate arbiter of issues of federal constitutional law, the Supreme Court of the United States. *See Taylor*, 218 A.3d at 1292 n.8 (Dougherty, J., OISA) ("[I]n in every practical sense,

restoring a PCRA petitioner's right to seek reargument would place the petitioner on the same footing as [the defendant in *Williams*]: it would allow this Court an opportunity to determine whether a due process violation occurred and, if the Court declines to grant reargument, the petitioner could seek review of that decision before the United States Supreme Court, just as Williams did.").[12]

---

[12] Oddly, the Majority suggests my approach "creat[es] a bifurcated system of post-conviction review, where all post-conviction claims are cognizable under the PCRA, except for post-conviction claims premised upon alleged judicial bias." Majority Opinion at 28. But my position is quite the opposite. To reiterate, it is my position that a judicial bias-based due process claim **is** cognizable under the PCRA and, if proven, warrants relief in the form of a *nunc pro tunc* right to seek reargument before the appellate tribunal. The fact that this is not the "same relief afforded to remedy other claims of constitutional magnitude that occur on appeal," *id.*, reflects only the reality that there are distinct constitutional concerns implicated by a PCRA court's grant of a *nunc pro tunc* appeal to remedy a claim of appellate-level judicial bias. On this front, it is important to reiterate that, despite the Majority's repeated characterization of a *nunc pro tunc* appeal as a "well-established form of relief[,]" Majority Opinion at 14 n.7 and 17 n.8, in truth, we have previously only authorized its use to remedy situations "where counsel's conduct has adversely affected the right to appeal[.]" *Commonwealth v. Stock*, 679 A.2d 760, 763 (Pa. 1996); *id.* at 764 ("'[T]he remedy of a *nunc pro tunc* appeal is intended to vindicate the [defendant]'s **right to appeal** in certain extraordinary situations where that right to appeal has been lost.") (emphasis in original). Here, of course, appellant's constitutional claim sounds in due process, not the denial of his right to appeal. There is nothing surprising or inequitable about fashioning different remedies for different constitutional errors. And although it is true "[a] new appeal will vindicate both types of constitutional deprivation[,]" Majority Opinion at 19, this does not change the fact that application of the remedy reserved for the deprivation of the right to appeal to the present circumstances would itself amount to a constitutional violation. Shockingly, the Majority all but admits this, *see* Majority Opinion at 25-26 (acknowledging the retroactive removal of a jurist may "amount to a sanction of the offending jurist" but deeming it a "collateral consequence" beyond the concern of PCRA courts), but it attempts to distract from this concession by suggesting I am more interested in protecting fellow jurists from being sanctioned than I am in guarding against "a violation of a person's constitutional rights." *Id.* at 24-25. The concurrence appears to cast similar aspersions. *See* Concurring Opinion at 4 (stating "[n]o one is above the law"). Inflammatory and baseless accusations aside, the reality is that the Majority has gone to great lengths to create a false dichotomy, making it appear as though we must choose between vindicating an individual's constitutional right to due process or prohibiting inferior courts from sanctioning other jurists in violation of the Pennsylvania Constitution. That is not the case. My perspective allows for the vindication of an individual's constitutional rights while also respecting the constitutional system and

As a final corollary, and with respect to the Majority's emphasis on vindicating appellant's constitutional right to an impartial tribunal, *see* Majority Opinion at 26-27, it is important to recognize there are other significant interests that are inseparably intertwined with whatever relief we sanction to remedy collateral claims of judicial bias. In *Reilly*, we remarked that "[q]uestions concerning the fairness, impartiality, or bias of the trial court always affect the administration of justice and can cloak the whole system of judicature with suspicion and distrust. Because recusal requests call into question our ability to mediate fairly, they raise important issues in which the public is concerned." 489 A.2d at 1301. However, we were careful to note that, when a jurist's participation in a case is challenged collaterally, "different considerations come into play." *Id.* We stated:

> Charges of prejudice or unfairness made after trial expose [jurists] to ridicule and litigants to the uncertain collateral attack of adjudications upon which they have placed their reliance. One of the strengths of our system of justice is that once decisions are made by our tribunals, they are left undisturbed. Litigants are given their opportunity to present their cause and once that opportunity has passed, we are loathe to reopen the controversy for another airing, save for the greatest of need. This must be so for the security of the bench and the successful administration of justice.

*Id.*; *see also In re Crawford's Estate*, 160 A. 585, 587 (Pa. 1931) ("It is of great importance to the administration of justice" "that causes may not be unfairly prejudiced, unduly delayed, or discontent created through unfounded charges of prejudice of unfairness made against [a] judge[.] . . . This must be so for the security of the bench and the successful administrative of justice."); *League of Women Voters of Pa. v. Commonwealth*, 179 A.3d 1080, 1085 (Pa. 2018) (Wecht, J., single-Justice order) (acknowledging our

---

the balance of judicial power established by our own charter. The Majority's willingness in this case to condone a remedy that so blatantly violates the Pennsylvania Constitution while simultaneously divesting us of our own powers is, quite frankly, an egregious mistake by the very Court that "long ago warned against any judicial inclination to narrow [our] authority, lest the members of the Court abandon their duty to exercise the power they hold in trust for the people." *In re Bruno*, 101 A.3d at 679.

precedents indicate "courts are particularly wary of attempts to seek disqualification of a judge after judgment has been entered") (citations omitted).

From my perspective, affording a petitioner the right to seek reargument of an allegedly tainted appellate court decision strikes the appropriate balance between the various competing constitutional interests involved. It reserves exclusively for this Court the ultimate right to decide whether one of its prior decisions should be reconsidered, as the Pennsylvania Constitution demands. This, in turn, promotes public confidence in the judicial system and guards and protects the dignity and authority of this Court. It also allows this Court to meet its responsibility to safeguard the integrity of the Unified Judicial System against judicial impropriety, when warranted. On the other side of the scale, the relief I propose creates a path for a petitioner to present his due process claim — when first deemed viable by a PCRA court — directly to the tribunal that allegedly committed the constitutional error. It also affords the petitioner the right to seek further review of that decision in the Supreme Court of the United States. Through these means, the petitioner is more than able to vindicate his constitutional rights, assuming, of course, that there has been a violation in the first place.

To put it succinctly, the *nunc pro tunc* reinstatement of the right to seek reargument is the only lawful remedy for a judicial bias-based due process claim raised on collateral review.

### III. Conclusion

The PCRA court erred by dismissing appellant's petition without first addressing: (1) whether it was timely filed, and (2) whether appellant met his burden of establishing his eligibility for relief. Accordingly, I would reverse and remand with instructions that the PCRA court make those threshold findings in the first instance. Because we presently lack jurisdiction to consider any broader substantive issue concerning the appropriate

relief that may be afforded if the PCRA court ultimately determines appellant's petition was timely filed and is meritorious, I dissent from the balance of the Majority's non-binding advisory opinion.

Justice Mundy joins this concurring and dissenting opinion.